# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-KA-01809-SCT

*DANIEL OUTERBRIDGE a/k/a DANIEL NIAN OUTERBRIDGE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/20/2005 |
| TRIAL JUDGE: | HON. BOBBY BURT DELAUGHTER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: W. DANIEL HINCHCLIFF |
| DISTRICT ATTORNEY: | ELEANOR JOHNSON PETERSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/07/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND DICKINSON, JJ.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This appeal comes from Daniel Outerbridge's conviction in the Hinds County Circuit Court, First Judicial District, for armed robbery pursuant to Miss. Code Ann. Section 97-3-79. Outerbridge asserts that the trial court erred by failing to suppress evidence of an improperly suggestive identification, allowing hearsay testimony to improperly bolster the victim's statements, and allowing the prosecutor to make an inappropriate "golden rule"

comment during the State's closing argument. Concluding that these issues are without merit, we affirm Outerbridge's conviction and sentence.

**FACTS**

¶2. Around 7:00 P.M. on February 2, 2003, Aaron Clark was cleaning his work van in the parking lot of his apartment complex. As he leaned across the driver's seat he felt a gun barrel pushed into his back and heard a male voice say "give me what you got." Clark turned to face the gunman and told him that he did not have anything on him and that in fact he did not have any pockets in the jogging pants he was wearing. Clark testified that he was face-to-face with the gunman and that a large black automatic pistol was being held against his chest.

¶3. After seeing that Clark did not have anything, the gunman stepped back while still holding the gun on him and said "there must be something in the van that I can take." Clark informed him that it was a company van and that there was nothing of value inside, but suggested that he see for himself. After ascertaining there was nothing of value in the van, the gunman ran away.

¶4. Clark immediately called the Jackson Police Department and reported the incident, describing the gunman as a light-skinned young black male with a light mustache and braids in his hair. Clark told the police that the gunman was between 5'9" and 6' tall, weighed approximately 145 pounds, and was wearing a gray shirt or sweater with a pullover hood and dark pants with shiny black shoes. Officer Cesar Hamilton arrived on the scene within half an hour of the incident and Clark gave him an identical description, which was radioed to other officers so they would be on the lookout for an individual matching the description.

2

¶5. Hamilton received a call about another armed robbery in progress and left to respond to that call. Approximately one hour later he returned to get Clark and take him to a local gas station to identify a suspect who matched the description Clark had given. En route Clark heard radio transmissions about the detained suspect. When they arrived at the gas station Clark remained in the patrol car while other officers at the scene produced the handcuffed suspect, later identified as Outerbridge, from another patrol car. At a distance of about fifteen feet Clark was able to identify Outerbridge positively as the man who had earlier held a gun on him.

¶6. The next day Clark went to the police station to speak with a Jackson Police Department detective. During the course of Clark's interview a photo lineup was conducted, and Clark positively identified Outerbridge from the six-person photo lineup.

## ANALYSIS

### I. IDENTIFICATION EVIDENCE

¶7. Outerbridge asserts two reasons why the trial court erred in allowing the State to present Clark's pre-trial identification. The first is that the show-up, which occurred at the gas station, was unjustifiably suggestive and also led to Clark's identification of Outerbridge in the photo lineup the following day. The second is that the individuals in the photo lineup were "too indistinguishable from Outerbridge", as they all looked almost exactly alike, thus increasing substantially the likelihood of mistaken identity.

¶8. This Court's standard of review regarding the admissibility of evidence is abuse of discretion. *Johnston v. State*, 567 So. 2d 237, 238 (Miss. 1990). Unless a trial court abuses

3

it's discretion in admitting the specific evidence this Court will not find error. *Shearer v. State*, 423 So. 2d 824, 826 (Miss. 1983). The standard of review for trial court decisions regarding pretrial identification is "whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted." *Roche v. State*, 913 So. 2d 306, 310 (Miss. 2005). We will only disturb the order of the trial court where there is an absence of substantial credible evidence supporting it. *Id.*

¶9.     The holding of *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), which has long guided this Court's decisions on eyewitness identifications, established the central question as being "whether under the 'totality of the circumstances' the identification was reliable even through the confrontation was suggestive." It held, inter alia, that five "factors to be considered in evaluating the likelihood of misidentification include  the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation,  and the length of time between the crime and the confrontation." *Id*. at 199.   In *York v. State*, 413 So. 2d 1372, 1381 (Miss. 1982), this Court  provided a detailed history and analysis of the law regarding both pretrial and in-court identification, recognizing the importance of eyewitness identifications while at the same time warning of the troubles which can arise from mistaken identifications.  In evaluating the likelihood of misidentification of York following an

4

allegedly suggestive police procedure, this Court applied the five factors established by *Biggers* and affirmed York's conviction and sentence.

¶10.   Outerbridge asserts that the show-up was unnecessary, impermissibly suggestive and tainted Clark's subsequent photo identification. Applying the *Biggers* factors in its ruling on a pretrial motion to suppress the identifications, the trial court found otherwise:

> The Court finds beyond a reasonable doubt from the totality of the circumstances that Mr. Clark had an excellent opportunity to view the assailant during the time of the commission of the crime. The Court finds that there was a high degree of attention given by Mr. Clark to his assailant during that period of time. Duration was such that it provided excellent opportunity for Mr. Clark to observe, not only a clothing description, but a physical description and facial description of the assailant as well. The Court finds beyond a reasonable doubt that the description was highly accurate when compared with the actual physical description of the defendant following his apprehension.

The trial court went on to find the duration between the crime and the photo lineup was relatively short, and that after taking approximately ten minutes reviewing the photographs, Clark "expressed 100 percent degree or level of certainty" in his identification of Outerbridge. Further the trial court called the photo lineup "one of the best I have ever seen." Despite "whatever taint may have been involved by the impermissibly suggestive how-up", the trial court found "from the totality of the circumstances beyond a reasonable doubt" that Clark's identification was admissible.

¶11.   This Court has stated that historically, show-ups have been condemned as impermissibly suggestive and have been disapproved because they increase the likelihood of misidentification. *York*, 413 So. 2d at 1381. The eyewitness is apt to retain the image of the individual displayed during the show-up rather than the actual assailant. *Id*. at 1378.

5

This could be true in the present situation, where Clark overheard Hamilton speaking with other officers and say to them "well, that's our guy." *See id*.

¶12.   In rare situations, as in *York,* show-ups are appropriate. *Id.* at 1377. However, the facts in the present case were markedly different from those in *York*, where the eyewitness was grievously injured by her assailant, it was not clear she would survive long enough for proper identification procedures to take place, and as a result of these exigencies such a procedure was appropriate. *Id*. at 1378. No exigencies existed in the present situation. Outerbridge was already in custody, and Clark was neither grievously injured nor was there any threat that he would be unavailable to participate in a later lineup. Although it was inappropriate for the police to conduct the show-up in the manner they did, and the procedure threatened the admissibility of Clark's later identification, our inquiry does not end there. We proceed to review the reliability of the eyewitness identification under the *Biggers* factors and weigh it against the corrupting effect of the suggestive identification. *Roche,* 913 So. 2d at 311.

¶13.   Despite the suggestiveness of the show-up, Clark's identification is still admissible because there is factual evidence which overcomes the likelihood of misidentification. Applying the *Biggers* five-prong test, it is clear that Clark had an excellent opportunity to view Outerbridge during the robbery. Outerbridge was at arms' length to Clark while standing face-to-face with him for a period of three to five minutes. Admittedly it was evening, but the parking lot was well lighted with street lights. It is also clear that Clark had every opportunity to pay close and undivided attention to Outerbridge during the robbery,

6

as evidenced by the level of accuracy with which he was able to describe Outerbridge to the police. Clark's description of Outerbridge's clothes and physical characteristics provided a degree of accuracy that permitted the police to find a suspect with the same characteristics within an hour.

¶14.    When Clark identified Outerbridge at the gas station, in the photo lineup, and at trial he expressed 100 per cent certainty that Outerbridge was the gunman. Outerbridge claims that Clark took approximately fifteen minutes to pick him out of a photo lineup and that is prima facie evidence of his lack of certainty. We agree with the opinion of the trial court that fifteen minutes is not a long period of time for a witness to investigate a photo lineup. Witnesses should be encouraged to pause and deeply consider their identifications, viewing all possible photos prior to making a decision. Additionally, less than 24 hours transpired between the robbery and photo lineup. There is no doubt that the assailant's image was fresh on Clark's mind when he identified Outerbridge. The ***Biggers*** factors weigh strongly in favor of admissibility of the pre-trial identification. Looking at the totality of the circumstances, we conclude the trial court did not abuse its discretion in admitting this evidence.

¶15.    Outerbridge also asserts that the six individuals in the photo lineup were so similar in appearance there was an extreme likelihood of misidentification, citing no authority for this position except a U.S. Department of Justice training manual. Although this argument is novel, it lacks substance. The purpose of a photo lineup is to provide witnesses a set of individuals who are similar in physical characteristics so that only someone who was actually

7

familiar with the accused would be able to identify them. *See **Brooks v. State***, 748 So. 2d 736, 742 (Miss. 1999). This Court's decisions are replete with examples of identifications being challenged because the photos were dissimilar but we found none challenging it on the basis of too much similarity. If this Court adopted such an approach there would be an unnecessary limit on the use of identification evidence, in both directions. It is logical that the police should not use images of individuals who are dissimilar; however, the converse is illogical. It is in the best interest of the accused that the other individuals in the photo lineup have similar characteristics as it ensures that an identification is made by someone familiar with the accused. Considering the totality of the circumstances, we conclude the trial court did not abuse its discretion with regard to the identification issues.

## II.    IMPROPER BOLSTERING

¶16.    Outerbridge asserts that the trial court erred in allowing Officer Hamilton to testify, over objection, as to details of the crime and Outerbridge's physical description. During direct examination the State asked Hamilton to describe the series of events from first receiving the call from dispatch until the show-up. During that dialogue Hamilton testified to statements made to by the dispatch officer, another fellow officer, and Clark before and during the show-up. Outerbridge now asserts that the trial court's error violates this Court's decision in ***Ratcliff v. State***, 308 So. 2d 225 (Miss. 1975), and ***Anderson v. State***, 171 Miss. 41, 156 So. 645 (1934). We disagree.

¶17.    This Court has recently addressed arguments based on both ***Ratcliff*** and ***Anderson***. We found ***Anderson*** irrelevant and factually distinguishable in an analogous situation in

*Hobgood v. State*, 926 So. 2d 847, 853 (Miss. 2006). That situation involved a police officer who met with a child sex abuse victim and a social worker, and later testified at trial as to the substance of the discussions he had with these individuals. This Court found that the trial court did not err in admitting the police officer's testimony because it did not go to the truth of the matter asserted but rather described why the officer acted as he did in arresting the defendant. *Id.*

¶18. Outerbridge's reliance on *Ratcliff* is likewise misplaced. This Court recently dealt with a bolstering argument based on our holding in *Ratcliff* which said that statements of an informant to investigators were inadmissible hearsay. See *Mixon v. State*, 921 So. 2d 275, 278-79 (Miss. 2005). The Court distinguished these two cases, however, stating the linchpin of the *Ratcliff* decision was that "an accused person is entitled to be confronted with and have opportunity to cross-examine witnesses against him" and Ratcliff was not given that opportunity. *Id.* at 279. In the present case, however, Clark was present at trial and did testify subject to cross-examination. Outerbridge had every opportunity to cross-examine Clark as to the substance of his identification and in fact did so. Officer Hamilton's testimony did not go to the truth of the matter asserted but rather explained why Hamilton acted the way he did. The report from the dispatcher led to Hamilton's canvassing the area looking for an individual who matched Outerbridge's description. Statements taken by Hamilton from Clark explained why Hamilton alerted other officers to look for an individual matching Outerbridge's description. Those statements were not intended to prove that Outerbridge committed the crime. The trial judge even instructed the jury sua sponte of the

9

limited purpose for using such statements, thereby dispelling any inappropriate or inadvertent use of that testimony. There was no error in admitting Hamilton's testimony.

### III. GOLDEN RULE ARGUMENT

¶19. Outerbridge finally asserts that during closing argument the State improperly asked the jury to put themselves in the victim's place, thus violating the golden rule argument which this Court has long prohibited. See *Chisolm v. State*, 529 So. 2d 635, 640 (Miss. 1988). During closing argument the prosecutor said the following:

> Now [Outerbridge] says that [the victim's] not reliable. But I want you to consider. Aaron Clark didn't say big guy, big gun. He said, five-nine to six foot, 145 pounds, light-skinned, light mustache – light mustache, gray hooded shirt, black pants, shiny black shoes. I don't know what kind of gun it was but it wasn't a revolver. He didn't say, hey, big guy, big gun. He came in and started taking stuff from him. He didn't try to pump it up. He didn't try to make his story better than it was. If he would have done that we would get from him, oh, he took a lot of money. He didn't tell you that. He told you, I didn't have anything on me.
>
> And how did he get a good look at who was robbing him? Well, the guy is going through his car. You never forget the man that puts a gun to your chest and holds your life in his hands. For those three minutes he was at the mercy of Daniel Outerbridge. This not a face you forget, ladies and gentlemen. I hope that none of you ever have to be in this situation. That is not –

The objection that followed was overruled by the trial court.

¶20. On appeal this Court reviews the propriety of closing arguments with discretion to the trial court. *Stevens v. State*, 806 So. 2d 1031, 1057 (Miss. 2001). The trial court is in the best position to determine if an alleged improper comment had a prejudicial effect; and therefore, absent an abuse of that discretion, the trial court's ruling will stand. *Id*. (citing *Roundtree v. State*, 568 So. 2d 1173, 1178 (Miss. 1990)).

10

¶21. We have succinctly explained the justification for prohibiting a golden rule argument as follows:

> It is the essence of our system of courts and laws that every party is entitled to a fair and impartial jury. It is a fundamental tenet of our system that a man may not judge his own case, for experience teaches that men are usually not impartial and fair when self interest is involved. Therefore, it is improper to permit an attorney to tell the jury to put themselves in the shoes of one of the parties or to apply the golden rule. Attorneys should not tell a jury, in effect, that the law authorizes it to depart from neutrality and to make its determination from the point of view of bias or personal interest.

See *Chisolm*, 529 So. 2d at 639. There we concluded that "the argument was sufficiently insignificant in the overall context of the case before us" that we found the error harmless. *Id.* at 640.

¶22. This Court has also stated that "attorneys are allowed wide latitude in their arguments 'limiting them not only to facts, but also to deductions and conclusions which may be drawn therefrom, and to the application of the law to those facts.'" *Stevens*, 806 So. 2d at 1057 (quoting *Holly v. State*, 716 So. 2d 979, 988 (Miss. 1998)).

¶23. Even when a prosecutor has made an impermissible comment, this Court requires a showing of prejudice to warrant reversal. *Ormond v. State*, 599 So. 2d 951, 961 (Miss. 1992). Where a prosecutor has made an improper argument, the question on appeal is whether the natural and probable effect of the improper argument creates an unjust prejudice against the accused resulting in a decision influenced by the prejudice so created. *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997) (citing *Davis v. State*, 530 So.2d 694, 701 (Miss. 1988)).

11

¶24. The prosecutor's comment, when taken in context, did not ask the jurors to put themselves in the victim's place to determine Outerbridge's guilt. Rather the comment urged them to believe the victim's identification. The Court of Appeals recently dealt with a similar factual situation in *Brown v. State*, 839 So. 2d 597 (Miss. Ct. App. 2003), where that court drew a distinction between prosecutorial comments that urge the jury to put themselves in the victim's place for the purpose of determining guilt, and the same comment used to weigh the credibility of the victim's identification. The Court of Appeals found the latter use admissible. *Id*. at 601. The latter approach is in keeping with this Court's goal in *Chisolm* because it preserves the jury's neutrality on the ultimate issue while allowing it to weigh the credibility of the witness. Today we adopt that standard. We find no merit to Outerbridge's third issue.

## CONCLUSION

¶25. For the reasons set forth above, Outerbridge's arguments are without merit. We affirm the circuit court's judgment.

¶26. **CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIFTEEN(15) YEARS TO SERVE AND FIFTEEN (15) YEARS SUSPENDED AND FIVE (5) YEARS OF SUPERVISED PROBATION, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., AND EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., CONCUR IN RESULT ONLY.**

12