# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-00390-SCT

*JAMES McCOY a/k/a ROBERT JOHNSON a/k/a*
*JAMES DESEAN McCOY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/01/2011 |
| TRIAL JUDGE: | HON. ANDREW K. HOWORTH |
| TRIAL COURT ATTORNEYS: | LATRICE WESTBROOKS |
| | KELLY LUTHER |
| | MICKEY MALLETTE |
| COURT FROM WHICH APPEALED: | UNION COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| | GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: SCOTT STUART |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/18/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., CHANDLER AND KING, JJ.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1. James McCoy appeals his convictions and sentences in the Union County Circuit Court for two counts of armed robbery. McCoy's appellate counsel argues that McCoy's sentences are excessive and the result of vindictiveness, that McCoy was denied a fair trial

due to the prosecutor's use of the golden-rule argument, and that McCoy received ineffective assistance of counsel at trial. McCoy has filed a *pro se* supplemental brief, raising four additional assignments of error. Finding no reversible error, we affirm McCoy's convictions and sentences.

**FACTS**

¶2. This case arises out of the March 8, 2006, armed robbery of Michael and Heather Whittington at their home in Union County. During the evening on that date, Michael, Heather, and their two daughters were at their home on County Road 56 in Myrtle, Mississippi, when two men forcibly entered their house. The men entered the master bedroom and demanded that Michael give them all of his money or they would kill his children. Michael attempted to fight the men, but one of them struck him over the head with a pistol, knocking him unconscious. One of the men searched the pockets of Michael's pants and took his cash, credit cards, and wallet. Michael had cashed a check at the Bank of New Albany earlier that day and had roughly four thousand dollars on his person. The men then entered the master bathroom, held Heather at gunpoint, and took her engagement ring, her wedding band, and another diamond ring from her. After the intruders left the house, Heather called 9-1-1.

¶3. Jimmy Dean Whitten, a criminal investigator with the Union County Sheriff's Department, was one of the first law-enforcement officers to arrive at the Whittington residence after Heather's 9-1-1 call. Investigator Whitten attempted to take statements from Michael and Heather at the scene, but Michael was barely conscious due to his injuries, and Heather was too distraught to give an accurate description of the robbery.

2

¶4.	Mickey Baker, an investigator with the Mississippi Highway Patrol, also was called to investigate the robbery. Investigator Baker was notified that some sheriff's deputies had located a black GMC pickup truck, still running, abandoned a short distance from the Whittingtons' house. The truck had been reported stolen two days earlier in Memphis, Tennessee. Investigator Baker went to search the truck. Inside the truck, Investigator Baker found purple Bank of Albany money wrappers, which were later identified as the ones that had been wrapped around the cash Michael had received at the Bank of New Albany earlier that day. The wrappers contained the teller's initials and the date "March 8, 2006." After searching the truck, Investigator Baker received a call from a resident in the area claiming he had seen the black truck driving in the area earlier in the day, followed by a small light-blue car.

¶5.	Investigator Baker visited the Whittingtons in the hospital at around 11:30 p.m. on the night of the robbery. At that time, the Whittingtons were able to give him a description of the robbers. Michael described one of the men as a medium-build, dark-skinned, African-American male wearing a dark jacket and some kind of head covering, either a hood or a hat. This man was carrying a revolver. He believed the other man may have been white, but stated that he never got a good look at him. Heather described one of the robbers as a dark-skinned African-American male with a "round chubby face" and rough complexion and at least one gold tooth. She stated that this man was wearing a camouflage hooded jacket. Heather described the other robber as a light-skinned African-American or white male with smoother complexion. This man was wearing a black or brown jacket and either a hood or

3

a hat. Heather estimated that both men were between 5' 10" and six feet tall and weighed between 180 and 200 pounds.

¶6.     Through further investigation, the Union County Sheriff's Department determined that the robbers were likely from the Memphis area. Several days prior to the robbery, Michael had called the police to report a black Volvo with Memphis tags driving past his house.[1] The Whittingtons' credit cards also had been used in the Memphis area after the robbery, prior to being cancelled. Michael owned a scrap-metal business and dealt primarily in cash, so Investigator Baker asked him to notify the sheriff's department if he could think of anyone from the Memphis area with whom he recently had done business.

¶7.     On April 4, 2006, Michael called the Union County Sheriff's Department and stated that a man from Memphis named Steven Ryan Davis had just come to his shop to sell some scrap metal. Michael had done business with Davis on numerous occasions and always paid Davis in cash. Officers with the Union County Sheriff's Department located Davis and stopped his vehicle. Davis was driving his father's truck with a suspended license and no proof of insurance, so he was taken into custody. When questioned about the robbery, Davis denied any involvement in or knowledge of the crime. However, Davis did admit that he owned a light blue Plymouth Colt, which matched the description of the car seen near the Whittingtons' house on the night of the robbery. Davis posted bond for his traffic offenses and was released from police custody the same day.

---

[1] Michael testified that he followed the black Volvo away from his house and reported the license plate number to the police because he knew that no one living on County Road 56 drove that particular car.

4

¶8.    Investigator Baker later questioned Davis a second time while he was in custody in Memphis. At this interview, Davis admitted to his involvement in the robbery and provided Baker with information on two men nicknamed "Alligator" and "Baby J," the other men involved in the robbery.

¶9.    "Alligator," also known as Allery Hopson, was arrested after the police recovered Heather's rings from two pawn shops in Memphis and determined that he had pawned them. Hopson owned a black Volvo with Memphis tags matching the license-plate number recorded by Michael several days prior to the robbery. Investigator Baker described Hopson as a light-skinned African American with a smooth complexion, while he described McCoy as a dark-skinned African American with a round face and gold teeth.

¶10.   "Baby J," also known as James McCoy, subsequently contacted the Union County Sheriff's Department and denied any involvement in the crime. After being told that the police were checking surveillance video from several places in Memphis where the Whittingtons' credit cards had been used, McCoy contacted the sheriff's department again and told them that Hopson and Davis had implicated him in the robbery in an attempt to keep Davis's family from finding out about his involvement in the crime. He stated that he had loaned Hopson his phone on the night of the robbery and had met up with Hopson and Davis at a gas station in Memphis after the robbery. McCoy subsequently was arrested for the robbery, as well.

## PROCEDURAL HISTORY

¶11.   McCoy, Hopson, and Davis were indicted for two counts of robbery using a deadly weapon in violation of Section 97-3-79 of the Mississippi Code. On November 14, 2007,

McCoy pleaded guilty to both counts. The trial court sentenced McCoy to thirty years' imprisonment for each count, with five years suspended from each sentence and five years of post-release supervision. The court ordered McCoy's sentences to run concurrently.

¶12. On February 9, 2009, McCoy filed a petition for post-conviction relief in the trial court, claiming that he had received incorrect information regarding his eligibility for parole. The trial court denied McCoy's petition, and his appeal was assigned to the Court of Appeals. *See **McCoy v. State***, 47 So. 3d 1197 (Miss. 2010). The Court of Appeals found merit in McCoy's claims and remanded for an evidentiary hearing to determine whether McCoy had relied on the incorrect information in entering his plea, as well as whether his attorney was ineffective in providing erroneous information. ***Id.*** at 1198-99. On remand, the trial court determined that McCoy's convictions and sentences should be set aside. McCoy subsequently entered pleas of not guilty to the offenses charged.

¶13. McCoy was tried before a jury in the Union County Circuit Court on November 15, 2011. At trial, Davis testified that he had done business with Michael on several occasions, knew where he lived, and knew he dealt in large quantities of cash. Davis stated that he owed a large drug debt to Hopson prior to the robbery. Hopson asked Davis if he knew someone he could rob to pay back the debt, and Davis gave him Michael's name. Prior to the robbery, Davis and Hopson drove to the Whittingtons' house in Hopson's black Volvo to show Hopson where where Michael lived. On the night of the robbery, McCoy drove Davis's car to the Whittingtons' house, while Davis rode with Hopson in a black truck. Davis stated that he had met McCoy before but knew him only as "Baby J" at the time. Davis noticed that the steering column on Hopson's truck was broken, indicating that it had been stolen. Before

arriving at the Whittingtons' house, Davis switched vehicles with McCoy, and Hopson and McCoy drove off while Davis waited in his car. He stated that he waited behind because he did not think he could have gone into the Whittingtons' house without Michael recognizing him. After about five minutes, Hopson and McCoy returned in the black truck, and Davis followed them away from the Whittingtons' house. A few miles later, Hopson left the truck on the side of the road, and he and McCoy rode with Davis back to Memphis. On the way back to Memphis, Davis dropped McCoy off at a gas station, where his car was waiting.

¶14. At the conclusion of the trial, the jury entered a verdict finding McCoy guilty of both counts of armed robbery. The jury could not agree to fix a life sentence, so the trial court sentenced McCoy to thirty-five years' imprisonment for each charge, with five years suspended from each sentence and five years of post-release supervision. McCoy's sentences were ordered to run consecutively.

¶15. McCoy, assisted by counsel, now appeals his convictions and sentences to this Court, raising the following issues:

> I. **Whether McCoy's sentences were unconstitutionally excessive, disproportionate, or the result of vindictiveness.**
>
> II. **Whether the trial court erred by failing *sua sponte* to declare a mistrial due to counsel's use of the "Golden Rule" argument.**
>
> III. **Whether McCoy was denied effective assistance of counsel.**

¶16. Whitten also has filed a pro se supplemental brief raising the following assignments of error:

> IV. **Whether the trial court erred in finding that the State had provided sufficient race-neutral reasons for striking two African-American alternate jurors.**

7

**V.** **Whether the State violated McCoy's right to be told about any promises made to Davis in exchange for his testimony.**

**VI.** **Whether McCoy's in-court identification was so suggestive as to violate due process of law.**

**VII.** **Whether McCoy was entitled to a circumstantial-evidence instruction.**

## DISCUSSION

**I.** **Whether McCoy's sentences were excessive, vindictive, or otherwise contrary to constitutional protections.**

¶17. McCoy argues that his consecutive thirty-five-year sentences constitute "the very definition of unfairness and disproportionality." He also claims that the difference between his sentence after his initial guilty plea and the sentence he received after his subsequent jury trial "smacks of a penalty exacted for exercising statutory and constitutional rights."

¶18. "[T]he general rule in this state is that a sentence cannot be disturbed on appeal so long as it does not exceed the maximum term allowed by statute." *Fleming v. State*, 604 So. 2d 280, 302 (Miss. 1992) (citing *Corley v. State*, 536 So. 2d 1314, 1319 (Miss. 1988)). However, a sentence that leads to an inference of "gross disproportionality" to the crime committed is subject to an attack on Eighth-Amendment grounds. *Solem v. Helm*, 463 U.S. 277, 290-91, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983), *overruled in part by Harmelin v. Michigan*, 501 U.S. 957, 965, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991). We address McCoy's proportionality argument and vindictiveness argument separately.

**A.** **Whether McCoy's sentences are unconstitutionally excessive or disproportionate to the offense.**

¶19.    McCoy was convicted of two counts of armed robbery in violation of Section 97-3-79 of the Mississippi Code, which provides for the imposition of a life sentence "if so fixed by the jury." Miss. Code Ann. § 97-3-79 (Rev. 2006). As in this case, though, where the jury fails to impose a life sentence, "the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years." *Id.* Because the imposition of a life sentence is within the sole province of the jury, the trial court must impose a sentence reasonably expected to be less than life. *See Friday v. State*, 462 So. 2d 336, 339 (Miss. 1985).

¶20.    We find that McCoy's sentences are not constitutionally disproportionate to the crime charged. At McCoy's sentencing hearing, the trial court reviewed mortality tables to determine that McCoy's life expectancy was 40.06 years. Accordingly, McCoy's thirty-five-year sentences fit well within the statutory limits. *See, e.g., Johnson v. State*, 29 So. 3d 738, 744 (Miss. 2009) (finding defendant's forty-one-year sentence to be effectively less than life, even though his actuarial life expectancy was 41.7 years). That McCoy's sentences were ordered to run consecutively does not change the analysis, as this Court has held that "each sentence is to be imposed without respect to the other." *Erwin v. State*, 557 So. 2d 799, 803 (Miss. 1990). Moreover, the fact that McCoy was a first-time offender did not preclude the trial court from imposing up to the maximum sentence. *Nichols v. State*, 826 So. 2d 1288, 1292 (Miss. 2002). Because the trial court sentenced McCoy within the statutory limits for the crime charged, we find no abuse of discretion here.

¶21.    In addition, a review of McCoy's sentences and the facts of this lurid case do not lend themselves to an extended proportionality review under *Solem*. McCoy argues that his

9

sentences are unfair because his codefendants were never prosecuted. But this allegation is not supported by the record. Davis testified that he expected to be tried for the robberies after McCoy and Hopson. Hopson had not been tried at the time of McCoy's trial, but there is no evidence that the charges against him were dismissed. Moreover, there is no requirement that codefendants receive identical punishment for an offense. *See Jones v. State*, 669 So. 2d 1383, 1393 (Miss. 1995). The evidence presented at trial showed that McCoy forcibly entered the Whittingtons' home, robbed them at gunpoint, threatened to kill their children, and knocked Michael unconscious. The quality of this crime is certainly serious enough to warrant a harsh penalty, within the statutory limits. The court, having heard this evidence, was entitled to exercise its discretion in fixing McCoy's sentence. This argument is without merit.

### B. Whether McCoy's sentences were the result of vindictiveness.

¶22. The Due Process Clause of the Fourteenth Amendment prohibits vindictiveness against a defendant for having attacked his first conviction from playing any part in the sentence he receives upon reconviction. *North Carolina v. Pearce*, 395 U.S. 711, 723, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 799, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989). "Beyond doubt, vindictiveness of a sentencing judge is the evil the [*Pearce*] Court sought to prevent rather than simply enlarged sentences after a new trial." *Texas v. McCullough*, 475 U.S. 134, 138, 106 S. Ct. 976, 89 L. Ed. 2d 104 (1986). Thus, where there is a "reasonable likelihood that the increase

10

in sentence is the product of actual vindictiveness on the part of the sentencing authority," there is a presumption of vindictiveness. *Smith*, 490 U.S. at 799.

¶23. However, no presumption of judicial vindictiveness arises "when the first sentence was based upon a guilty plea, and the second sentence follows a trial." *Id.* at 795. This Court has followed the United States Supreme Court's holding in *Smith* when dealing with claims of vindictiveness in cases involving successor judges, holding that "[a] judge imposing the second sentence but not the first has no reason to be vindictive concerning the defendant's attack of the first conviction." *Bush v. State*, 667 So. 2d 26, 29 (Miss. 1996). "Certainly, a judge who hears the defendant, the victim, and other circumstances of the crime at trial is entitled to impose a higher sentence than the judge who hears only the admission of guilt at a plea hearing." *Id.*

¶24. Here, Judge Howorth, the judge who sentenced McCoy after his trial, did not sentence him after his guilty plea. Because Judge Howorth did not impose McCoy's original sentence, he had "no personal stake in the prior conviction and no motivation to engage in self-vindication." *See Chaffin v. Stynchcombe*, 412 U.S. 17, 27, 93 S. Ct. 1977, 36 L. Ed. 2d 714 (1973). Where different sentencers impose varying sentences, "a sentence 'increase' cannot truly be said to have taken place." *McCullough*, 475 U.S. at 140. Accordingly, the burden remains on McCoy to prove actual vindictiveness in his sentencing. *See Smith*, 490 U.S. at 799.

¶25. Upon review of the record, we find that McCoy has failed to prove any actual vindictiveness in his sentencing. Prior to McCoy's sentencing hearing, Judge Howorth ordered a presentencing investigation and report of McCoy to be made. *See* URCCC 11.02.

11

Judge Howorth reviewed this report prior to the sentencing hearing and referred to it at the hearing. Judge Howorth also reviewed mortality tables to determine McCoy's life expectancy. At the sentencing hearing, McCoy was allowed to present mitigation testimony through his sister and through a letter from his wife. The defense also noted that McCoy had no prior criminal history. Judge Howorth took these factors into consideration but also stated several aggravating factors on the record, including the seriousness of the crime, that there were two victims, and that McCoy continued to deny responsibility for the crime. Judge Howorth used these aggravating factors to conclude that McCoy's sentences should run consecutively rather than concurrently. Having heard the circumstances of the crime through the evidence presented at trial, Judge Howorth was entitled to impose a harsher sentence than a judge who merely accepted McCoy's initial guilty plea. *See Bush*, 667 So. 2d at 29. McCoy has failed to prove that his sentences were the result of vindictiveness.

**II.     Whether the trial court erred by failing *sua sponte* to declare a mistrial due to counsel's use of the golden-rule argument.**

¶26.    "It has long been the law in this state that "golden rule" arguments, i.e., asking the jurors to put themselves in the place of one of the parties, will not be permitted in civil cases." *Chisolm v. State*, 529 So. 2d 635, 640 (Miss. 1988). In *Chisolm*, this Court expanded the prohibition against the "golden rule" argument to criminal cases. *See id.* at 641. The reason behind such a prohibition is the premise that a person should not be the judge of his own case, which has been stated by this Court as follows:

> It is the essence of our system of courts and laws that every party is entitled to a fair and impartial jury. It is a fundamental tenet of our system that a man may not judge his own case, for experience teaches that men are usually not impartial and fair when self interest is involved.

12

*Danner v. Mid-State Paving Co.*, 252 Miss. 776, 786, 173 So. 2d 608 (1965). On the other hand, it is well-settled that attorneys are granted wide latitude in making opening and closing statements. *Dampier v. State*, 973 So. 2d 221, 235 (Miss. 2008). The trial court is provided considerable discretion in determining whether a particular remark is so prejudicial that a mistrial should be declared. *Edmond v. State*, 312 So. 2d 702, 208 (Miss. 1975). When such a statement is "sufficiently insignificant in the overall context of the case," the result is harmless error. *Chisolm*, 529 So. 2d at 640.

¶27. McCoy argues that both the prosecutor and his own counsel made use of the golden-rule argument during trial. We address McCoy's attorney's statements as an ineffective-assistance claim below in Section III of this discussion.

¶28. McCoy argues that the following statement by the prosecutor during opening statements constituted an impermissible golden-rule argument:

> [The Whittingtons] are in their bedroom . . . . It's not another normal day in paradise, *but it's another day in Union County with normal people like me and you and everyone else*, and all of a sudden all of that changed. It wasn't a day in paradise anymore.

(Emphasis added.) McCoy claims this statement should have prompted the trial court to declare a mistrial.

¶29. McCoy did not object to the prosecutor's statement during opening statements and is therefore procedurally barred from raising this issue for the first time on appeal. *See Edwards v. State*, 737 So. 2d 275, 299 (Miss. 1999).[2] Accordingly, McCoy must rely on the

---

[2] McCoy also briefly argues that the prosecutor's reference to the people of Union County constituted an improper "send a message" argument. Again, because McCoy did not object to this statement at trial, he is procedurally barred from raising the issue on appeal.

plain-error doctrine to raise this assignment of error on appeal. *Foster v. State*, 639 So. 2d 1263, 1289 (Miss. 1994) (citing *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986)). Under this Court's plain-error review of alleged improper statements by trial counsel, this Court will reverse only if the attorney's statement "was so inflammatory that the trial judge should have objected on his own motion." *O'Connor v. State*, 120 So. 3d 390, 399 (Miss. 2013). This Court must determine "whether the natural and probable effect of the improper argument creates an unjust prejudice against the accused resulting in a decision influenced by the prejudice so created." *Outerbridge v. State*, 947 So. 2d 279, 286 (Miss. 2006) (citing *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997)) (internal citations omitted).

¶30.    We find that the trial court did not err in failing to grant a mistrial *sua sponte* based on statements by the prosecutor. The attorneys' statements, when taken into context, did not ask the jurors to put themselves in the victims' place to determine McCoy's guilt. By simply mentioning "normal people like me and you," the prosecutor did not ask the members of the jury to place themselves in the position of the Whittingtons under the specific circumstances of the crime. *See, e.g.*, *Holliman v. State*, 79 So. 3d 496, 499-500 (Miss. 2011) (finding that prosecutor committed reversible error in murder trial by asking jurors how they would feel if he walked into the courtroom and pointed a loaded shotgun at them, and the defendant was charged with fatally shooting his wife with a shotgun).

¶31.    Even assuming, *arguendo*, that this isolated statement could constitute a golden-rule argument, there is no evidence suggesting that McCoy was unduly prejudiced by the

*Edwards*, 737 So. 2d 275 at 299.

14

statement.  This Court has found harmless error in statements far more egregious than the one at issue in the instant case.  For example, in ***Chisolm***, another armed-robbery case, this Court found that the following statement by the prosecutor was not significantly inflammatory to influence the jury: "Think about yourself being a seventy-one-year old person, minding your own business, driving your own tractor on your own land, business as usual, and then one day this happens to you and, all of a sudden, you are laying there on the ground."  ***Chisolm***, 529 So. 2d at 640.  In addition, in ***Wells v. State***, 698 So. 2d at 506-07, a capital-murder case, this Court found the following statement by the prosecutor to be harmless error in light of the overwhelming evidence against the defendant:

> You know, this case hits kind of close to home to me.  I've got a thirteen year old.  Got another one that's not much older than that . . . . I can't imagine a set of circumstances when somebody could come into my house while my child is sitting on the couch watching television or asleep, stab them seventeen times– . . . [l]eave them on the floor to bleed to death, and then throw him in a shallow grave, and call that self-defense.  I couldn't call that anything but capital murder, and I would venture to say that if it was your child, you couldn't call it anything else either . . . . If you and I expect the law to protect our children or anybody else's children, then it has got to stand up for Gary Wells, too . . . .

"Exaggerated statements and hasty observations are often made in the heat of debate, which, although not legitimate, are generally disregarded by the court, because in its opinion they are harmless."  ***Monk v. State***, 532 So. 2d 592, 601 (Miss. 1988).  In the case at hand, we cannot say that the prosecutor's reference to "normal people like me and you" during opening statements was so inflammatory that the trial court should have objected on its own motion.  *See* ***O'Connor***, 120 So. 3d at 399.  We find that the challenged statements by the prosecutor do not "create[] an unjust prejudice against the accused resulting in a decision

15

influenced by the prejudice so created." *See **Outerbridge***, 947 So. 2d at 286. This argument is without merit.

### III.    Whether McCoy was denied effective assistance of counsel.

¶32.    "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ***Strickland v. Washington***, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The test for proving ineffective assistance of counsel is two-fold; the defendant must show that counsel's performance was deficient *and* that the deficient performance prejudiced the defense. ***Cabello v. State***, 524 So. 2d 313, 315 (Miss. 1988) (citations omitted). Under the first prong of ***Strickland***, "there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ***Strickland***, 466 U.S. at 689. Under the second prong, even if counsel's conduct is deemed to be "professionally unreasonable," the jury's verdict must stand "if the error had no effect on the judgement." ***Id.*** at 691. Accordingly, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." ***Id.*** at 694. "Generally, ineffective assistance claims are more appropriately brought during post-conviction proceedings." ***Bateman v. State***, 125 So. 3d 616, 633 (Miss. 2013) (citing ***Archer v. State***, 986 So. 2d 951, 955 (Miss. 2008)). However, such a claim may be raised on direct appeal "if such issues are based on facts fully apparent from the record." Miss. R. App. P. 22(b).

¶33.    McCoy asserts three claims of ineffective assistance: (1) his attorney failed to object to the prosecutor's golden-rule argument during opening statements, (2) his attorney used a

16

golden-rule argument during closing arguments, and (3) his attorney failed to request a cautionary instruction regarding Davis's testimony.

¶34. McCoy first claims that his trial attorney was ineffective for failing to object to an improper golden-rule argument made by the prosecutor during. We find that the record on appeal is sufficient to determine that this claim is without merit. As discussed above in Issue II, the prosecutor's reference to "normal people like me and you" did not constitute an impermissible golden-rule argument. Accordingly, McCoy's trial counsel could not have acted deficiently by failing to object to the that statement.

¶35. Second, McCoy argues that he received ineffective assistance of counsel when his own attorney used an impermissible golden-rule argument. As the basis for this argument, McCoy points to the following statement made by his attorney during closing arguments:

> Now, I want you to understand that I empathize with the Whittingtons. I really, really do, and I understand what it's like to have an evening interrupted by violence. I understand that. So nothing that I say here today is to undermine that or demean that in any way because I truly, truly empathize with them. *I also want you to understand that as jurors, not only do you put yourself in the shoes of the victims, but you also put yourself in the shoes of the defendant.* Also keep in mind that, as the Court has told you, every material element of the offense of armed robbery has to be proven beyond a reasonable doubt . . . .

(Emphasis added.) We find that the record is sufficient to find that this claim also is without merit. This Court has approved the use of the golden-rule argument as a method of weighing the credibility of a witness, as long as the jury's neutrality on the issue of guilt is preserved. *See **Outerbridge**,* 947 So. 2d 279, 286 (Miss. 2006). When the above statement is read in context with the surrounding argument, it is clear to this Court that McCoy's attorney was not asking the jurors to place themselves in either party's position for the purpose of

17

determining guilt, but was reminding the jury to consider both sides of the case, to refrain from relying on emotion, and to consider all of the evidence before reaching a verdict. McCoy's attorney did not act deficiently by making this statement. Therefore, this claim does not meet the first prong of the *Strickland* test.

¶36.   McCoy's third claim of ineffectiveness is that his attorney failed to request a cautionary jury instruction regarding the credibility of Davis's testimony. We find that this claim is not ripe for review on direct appeal, as it is not based on facts fully apparent from the record. Whether to request a certain instruction generally is a matter of trial strategy. *See Havard v. State*, 928 So. 2d 771, 790-91 (Miss. 2006). If McCoy's trial attorney intentionally failed to request a cautionary instruction regarding Davis's testimony, she may have done so as a part of her trial strategy. Post-conviction proceedings would give McCoy's trial attorney a fair opportunity to explain any possible strategy in foregoing to request such an instruction. *See, e.g., Grossley v. State*, 127 So. 3d 1143, 1149-50 (Miss. Ct. App. 2013); *Thompson v. State*, 995 So. 2d 831, 833 (Miss. Ct. App. 2008). This claim more appropriately would be brought in a petition for post-conviction relief. Accordingly, we hold that Gage's first two ineffective-assistance claims are without merit. We dismiss McCoy's third ineffective-assistance claim, regarding his attorney's failure to request a cautionary instruction, without prejudice so that he may raise this claim in a properly filed motion for post-conviction relief.

18

**IV. Whether the trial court erred in finding that the State had provided sufficient race-neutral reasons for striking two African-American alternate jurors.[3]**

¶37. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the use of peremptory challenges against jurors "solely based on their race." *Johnson v. State*, 529 So. 2d 577, 583 (citing *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)). When a party makes a claim that the opposing party has used a peremptory strike for a discriminatory purpose, the trial court employs the following procedure:

> (1) the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose; (2) once the defendant has made out a prima facie case the burden shifts to the State to explain adequately the racial exclusion by offering permissible, race-neutral justifications for the strikes; and (3) if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination. The burden remains on the opponent of the strike to show that the race-neutral explanation given is merely a pretext for racial discrimination.

*Pruitt v. State*, 986 So. 2d 940, 942-43 (Miss. 2008) (citing *Johnson v. California*, 545 U.S. 162, 168, 126 S. Ct. 2410, 162 L. Ed. 2d 129 (2005)). With regard to the *Batson* procedure, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez*

---

[3]Throughout his *pro se* brief, McCoy seems to suggest that the trial court erred in requiring the defense to provide race-neutral reasons for its peremptory strikes. The record does not support this allegation, as the State did not object to any of the defense's peremptory strikes. Thus, we discuss only the State's peremptory strikes that were challenged by McCoy.

*v. New York*, 500 U.S. 352, 359, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). "This Court reviews a trial court's ruling on a *Batson* challenge with great deference and will not overturn the trial court's ruling unless it is clearly erroneous or against the overwhelming weight of the evidence." *Id.* at 942 (citing *Flowers v. State*, 947 So. 2d 910, 917 (Miss. 2007)).

¶38.    McCoy claims that the trial court erred in failing to find that the State had committed a *Batson* violation by using two of its peremptory strikes on African Americans. During the selection of alternate jurors, the State used peremptory strikes on Barbara Robertson, Juror 41, and Willie Siddell, Juror 42, both of whom are African American. McCoy objected to these peremptory strikes. The State then offered race-neutral reasons for its strikes on the alternate jurors. The State explained that both of the stricken jurors had indicated during voir dire that they did not know if they could impose a life sentence for the crime of armed robbery. McCoy's counsel responded by claiming that the jurors in question had been rehabilitated during voir dire and therefore could not be challenged for that reason. The trial court ultimately denied McCoy's *Batson* challenge, finding that the State had offered a sufficient race-neutral reason for striking Jurors Robertson and Siddell.

¶39.    Considering the standard of review, and after careful scrutiny of the record, we find that the trial judge's denial of McCoy's *Batson* challenge was not clearly erroneous. The reasons offered by the State were race-neutral and supported by the record. When asked whether they could impose a life sentence in an armed-robbery case, Barbara Robertson stated, "I just don't know whether I could say life in prison for whatever, I don't know. If it warranted it, I don't know if I could or not . . . . I guess I could consider everything level

20

to start with, but I just feel like that's a lot for, you know, to decide somebody's life in prison, you know." And Willie Siddell, stated, "I don't know if I could be sending somebody for life like that for a crime like this or not.  I don't really feel comfortable about doing nothing like that." "A peremptory challenge does not have to be supported by the same degree of justification required for a challenge for cause." *Stewart v. State*, 662 So. 2d 552, 558 (Miss. 1995). A juror's unwillingness or inability to impose a legal sentence upon the defendant after reaching a guilty verdict certainly is a valid race-neutral reason for striking that juror. *Cf. Tanner v. State*, 754 So. 2d 385, 395 (Miss. 2000) (finding juror's statement that he would need a circumstantial-evidence instruction to "remove all reasonable doubt whatsoever in his mind," which is not the law in Mississippi, to be a valid race-neutral reason for a peremptory strike); *Manning v. State*, 735 So. 2d 323, 339 (Miss. 1999) (finding juror's disagreement with death penalty to be a sufficient race-neutral basis for upholding a peremptory strike against her).  Moreover, we do not find that the State's use of the two peremptory strikes in question evinces such a clear pattern of discrimination that its proffered explanations for the strikes are mere pretext.  This argument is without merit.

V.      **Whether the State violated McCoy's right to be told about any promises made to Davis in exchange for his testimony.**

¶40.    McCoy asserts that evidence of a plea bargain or other agreement for leniency between Davis and the State was relevant to his credibility as a witness, and the jury was entitled to know of any such agreement. McCoy then claims that the State entered into a plea agreement with Davis in exchange for his testimony and withheld this information from the jury.  McCoy argues that this withholding of evidence violated his right to due process.

¶41. The State must disclose any evidence that is favorable to the accused and "material either to guilt or to punishment[.]" ***Brady v. Maryland***, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Impeachment evidence, as well as exculpatory evidence, falls within the ***Brady*** rule. *See **Giglio v. U.S.***, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972). As the United States Supreme Court reasoned even before the ***Brady*** rule became law, "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." ***Napue v. Illinois***, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). This Court has specifically held that not only must a leniency agreement with a state witness be disclosed to the defense, but the defense also is entitled to present evidence of that agreement to the jury where such would tend to impeach or show bias in the testimony of the witness. ***Barnes v. State***, 460 So. 2d 126, 131-32 (Miss. 1986).

¶42. Nondisclosure of exculpatory or impeachment evidence does not automatically rise to the level of reversible error. "[T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." ***U.S. v. Augurs***, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Thus, "[t]o establish that a ***Brady*** violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is 'favorable to the accused either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either wilfully or inadvertently'; and (3) 'prejudice

22

ensued.'" ***Skinner v. Switzer***, 131 S. Ct. 1289, 1300, 127 L. Ed. 2d 233 (2011) (quoting ***Strickler v. Greene***, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

¶43.    The record in the instant case does not support McCoy's assertion that the prosecution suppressed evidence of a plea agreement between Davis and the State.  On the contrary, it was the State, not the defense, that initially revealed its agreement with Davis to the jury.  Prior to trial, the defense filed a Motion to Reveal the Deal, requesting the trial court to require the State to produce any evidence of any agreement made with Davis in exchange for his testimony.  The State responded that no formal plea agreement had been made, but Davis had been promised that his cooperation would be made known to the sentencer at the conclusion of his prosecution.  The State introduced this agreement during Davis's direct examination.  Davis explained that he believed the State was waiting to try him after McCoy and Hopson, who was still imprisoned in Tennessee at the time.  When asked if he had been promised anything in exchange for his testimony, he replied, "Just my cooperation will be noted to the Judge."  He further stated that he had not been promised any specific sentence. McCoy's attorney never objected to Davis's testimony.  During Davis's cross-examination, McCoy's counsel asked, "The reasons you have not [been tried] is because, in essence, you've been promised that this case would go away and it will be dismissed against you?" Davis again responded in the negative.  The record does not support McCoy's allegations that the State withheld any information regarding its promise to make Davis's cooperation known at his eventual sentencing, nor does it appear that any other hidden deal existed between Davis and the State.  This argument is without merit.

23

**VI. Whether McCoy's in-court identification was so suggestive as to violate due process of law.**

¶44. Usually, the suggestiveness of an identification is raised to challenge an in-court identification after a pretrial identification has been made. In such a case, the trial court would evaluate the factors announced in *Neil v. Biggers*, 409 U.S. 188, 196-98, 83 S. Ct. 375, 34 L. Ed. 2d 401 (1972), in order to determine whether the in-court identification testimony appears sufficiently reliable to overcome the taint of a prior improperly obtained identification. *See, e.g.*, *Butler v. State*, 102 So. 3d 260 (Miss. 2012). The standard of review in such cases is whether substantial credible evidence supported the trial court's findings regarding the admissibility of the in-court identification. *Id.* at 264.

¶45. Here, though, McCoy was not subjected to a pretrial identification. Rather, McCoy claims that Heather's in-court identification of him as one of the men who robbed her was impermissibly suggestive. In such a case, the general rule is that an in-court identification is not subject to suppression or objection unless it is shown to have been tainted by some suggestive out-of-court identification. *Smith v. State*, 430 So. 2d 406, 407 (Miss. 1983). This Court has held that the question in this type of case is "whether familiar standards of due process permit a conviction where the only identification ever made suffers from the suggestiveness of being directed at an individual who the witness knows has been arrested, indicted and brought to trial on the charge in question." *Gayten v. State*, 595 So. 2d 409, 418 (Miss. 1992). In *Gayten*, as in this case, the only identification of the defendant was made during trial by a witness. *Id.* The Court recognized that the defendant, represented by counsel, made no attempts to avoid a "suggestive identification forum. He did not request

24

that others be seated at the counsel table with him or that he be seated at some place other than the counsel table before [the witness] was brought into the courtroom and asked to identify him." *Id.* (citing *Moore v. Illinois*, 434 U.S. 220, 231 n.5, 98 S. Ct. 458, 54 L. Ed. 2d 424 (1977)). Because the defendant did not attempt to avoid the issue of a suggestive in-court identification, this Court found that he could not then claim a due-process violation resulting from the identification. *Gayten*, 595 So. 2d at 418. Ultimately, this Court held that the evidence was sufficient for a fair-minded jury to believe the witness's identification testimony. *Id.*

¶46. In this case, as in *Gayten*, no one made a pretrial identification of McCoy as a perpetrator of the robbery. Instead, Heather identified him at trial as one of the robbers. McCoy, who sat at the counsel table with his attorney, took no steps to avoid a suggestive in-court identification. Accordingly, McCoy cannot now complain that his due-process rights were violated by Heather's identification testimony. *See id.*; *Amos v. State*, 911 So. 2d 644, 653 (Miss. Ct. App. 2005). In addition, on review of all the evidence presented at trial, including the descriptions of McCoy offered by Heather and the other witnesses, we conclude that a fair-minded jury was entitled to find Heather's in-court identification of McCoy credible. This argument is without merit.

### VII. Whether McCoy was entitled to a circumstantial-evidence instruction.

¶47. When the evidence against the accused is wholly circumstantial in nature, the trial court must instruct the jury that the State is required to prove the accused's guilt not only beyond a reasonable doubt, but to the exclusion of "every reasonable hypothesis other than

25

that of guilt." *Manning v. State*, 735 So. 2d 323, 338 (Miss. 1999) (quoting *Givens v. State*, 618 So. 2d 1313, 1318 (Miss. 1993)). McCoy claims that he was entitled to such an instruction because the State failed to present direct evidence that he committed the robbery.

¶48. This argument is both procedurally barred and substantively without merit. First, McCoy did not request a circumstantial-evidence instruction at trial. Accordingly, McCoy is barred from raising this issue for the first time on appeal. *See Anderson v. State*, 904 So. 2d 973, 977 (Miss. 2004).

¶49. Notwithstanding the procedural bar, the evidence against McCoy was not wholly circumstantial in nature. This Court has held that direct evidence includes eyewitness testimony to the gravamen of the offense or a confession by the defendant. *Grayer v. State*, 120 So. 3d 964, 968 (Miss. 2013). Here, both Michael and Heather provided eyewitness testimony of the robbery. Specifically, Heather testified that McCoy took her jewelry from her at gunpoint. Therefore, a circumstantial-instruction was unwarranted in this case. This argument is without merit.

<u>**CONCLUSION**</u>

¶50. For the foregoing reasons, we affirm McCoy's convictions and sentences.

¶51. **COUNT I: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE (5) YEARS SUSPENDED AND THIRTY (30) YEARS TO SERVE, AFFIRMED. COUNT II: CONVICTION OF ARMED ROBBERY AND SENTENCE OF THIRTY-FIVE (35) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE (5) YEARS SUSPENDED AND THIRTY (30) YEARS TO SERVE, AFFIRMED. SENTENCE IN COUNT I TO RUN CONSECUTIVELY TO SENTENCE IN COUNT II FOR A TOTAL TERM OF IMPRISONMENT OF SEVENTY (70) YEARS, WITH TEN (10) YEARS SUSPENDED, AND SIXTY (60) YEARS TO SERVE. UPON HIS RELEASE, APPELLANT SHALL BE PLACED ON FIVE (5) YEARS OF POST-**

26

**RELEASE SUPERVISION. IN ADDITION, DURING THE PERIOD OF POST-RELEASE SUPERVISION, APPELLANT SHALL PAY $4,600 IN RESTITUTION TO THE VICTIMS, ALONG WITH ALL COURT COSTS.**

**DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**