# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00809-COA

**JAQUEZ DEVONTE PORTER A/K/A JAQUEZ PORTER**　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/20/2023 |
| TRIAL JUDGE: | HON. RANDI PERESICH MUELLER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | MICHAEL W. CROSBY |
| | TYLER RAY HEFLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/18/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Jaquez Davonte Porter appeals his conviction of capital murder and his sentence of life imprisonment with eligibility for parole for his participation in the killing of Madison Victoria Harris. On appeal, Porter raises numerous issues of alleged errors during his trial, including the admission of his confession as evidence, prosecutorial misconduct in comments made to the jury, and a challenge to the venire. Having reviewed the record and considered the arguments of counsel, we affirm Porter's conviction and sentence.

## FACTS

¶2.    Seventeen-year-old Porter and his friends Jarvis Jermaine Cook and sisters Willow Onedia-Louise Blackmon and Yakeshia Lashel Blackmon were together on February 24, 2020. Cook, who was driving his mother's car, picked up Porter, and eventually, they went to the sisters' house. There, Willow and Yakeshia, who had had a disagreement with the victim Harris (their former friend), talked about wanting to go beat up Harris.[1] During this discussion, the group saw a Snapchat post from Harris, showing a bag of marijuana with the word "Shop," indicating that Harris was selling marijuana. The group planned to go to Harris's house, who lived just three houses down the street, where the sisters would fight Harris while Porter and Cook would keep Harris's boyfriend, Paul White, from getting involved. Porter and Cook would also take Harris's marijuana.

¶3.    The group went to Walmart and then to Academy Sports, where Porter bought bullets for his 9mm Jiminez handgun. On the way back to Willow and Yakeshia's house, they contacted Jasmine Joy-Sade Kelley, who was still friends with Harris. They told Kelley their plan, and she agreed to go to Harris's house to let the group know where the marijuana was and who was at the house. The group picked up Kelley and dropped her off down the street from Harris's house, while Willow and Yakeshia went back to their house and changed into dark hoodies and bandanas.

¶4.    Kelley walked to Harris's house, and Harris let her in. The two began smoking marijuana and painting their nails. Harris's boyfriend, White, arrived soon after and started

---

[1] According to Willow, Harris had broken into their house, and they assumed Harris had taken Yakeshia's artificial eyelashes. A month before, Harris had accused Willow and Yakeshia of breaking into her house and called the police.

2

playing a video game. Kelley communicated what was happening inside the house to Cook via Snapchat. She messaged that White was there, but she did not think he had a gun. She said that the marijuana was there as well and that they could come to the house in five minutes.

¶5.     When Porter, Cook, Willow, and Yakeshia arrived, they went to Harris's bedroom window. Through the partially open window, Porter saw Harris, Kelley, and White inside and pointed his handgun at them. Porter told White to raise the window, but it was nailed shut and could go no further. While Porter pointed the gun at White, Harris, and Kelley, Willow and Yakeshia entered the home through the carport door. They went to Harris's bedroom, which was locked, but Kelley opened it and let the sisters in. As the sisters entered the room, Harris was on the phone with 911, but the call was disconnected when Yakeshia took the phone from Harris. Yakeshia then asked Porter for the gun, which Porter handed to her through the opened window. At that point, Porter and Cook went to enter the house through the carport door as well.

¶6.     Meanwhile, Willow fought Harris, White tussled with Yakeshia, who was holding the gun, and Kelley ran out of the room. As White and Yakeshia struggled, the gun went off, and the bullet struck Harris. Porter and Cook heard the gunshot as they were coming down the hall. They turned as the sisters came out of the bedroom and all fled, including Kelley. White, who had taken the gun from Yakeshia, ran after them. White tried to fire the gun, but it jammed. The group ran to the sisters' house, where Willow and Yakeshia changed their clothes. The group then left to go to the house of a friend of Kelley's. Ultimately everyone

3

returned to their respective homes, where they were eventually arrested.

¶7.    Back at the Harris home, Harris's father, Stewart Harris, had been in the back yard raking leaves and smoking a cigarette when the break-in occurred. He heard the gunshot and screaming and rushed inside. White ran by him, and Stewart followed him outside. White was running after two figures Stewart saw in black hoodies and Stewart ran back in the house. He found his daughter in the hall, moved her to the couch, and started CPR. White returned and called paramedics and 911.[2] Both law enforcement and medical personnel responded, and Harris was taken to the hospital. Police officers reviewed the doorbell-camera footage that showed the group of intruders. Officers were able to identify the car that the group used. All of them were eventually apprehended and taken into custody.

*Porter's Arrest and Interrogation*

¶8.    After Porter's arrest at his mother's house, he was taken to the police station where he was read and waived his *Miranda* rights.[3] Although Porter's mother arrived and asked to be in the room with Porter during his interrogation, her request was denied. Porter admitted to the facts of the group's plan to steal the marijuana and said he had provided the handgun that killed Harris. Porter had no attorney or relative present during his questioning. The interrogation was both audio- and video-recorded.

*Indictment and Pleas*

---

[2]  White also called his cousin who lived near-by and came to the scene.

[3]  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), provides that individuals who are interrogated while in custody must be advised of their right to remain silent and their right to an attorney.

¶9. On May 17, 2021, Porter, Cook, Willow, Yakeshia, and Kelley were indicted for capital murder pursuant to Mississippi Code Annotated section 97-3-19 (Rev. 2020) for wilfully and unlawfully killing Harris during the commission of the felony crime of robbery.[4] Their cases were severed, and Willow pleaded guilty to manslaughter and robbery, while Kelley and Cook pleaded guilty to manslaughter. Yakeshia pleaded guilty to second-degree murder and robbery. Porter pleaded not guilty. Porter's counsel told the court that he tried to negotiate a manslaughter plea for Porter, but the State refused.

*Motion to Suppress Statement*

¶10. On August 27, 2021, Porter filed a motion with several issues, including a motion to suppress Porter's confession. The State responded, and the court held a hearing on the issue on March 14, 2023. Before testimony was taken, Porter acknowledged that the law allows questioning of a minor (Porter was seventeen at the time) "if it appears the minor is not being coerced and that he understands the questions and can be responsive." Porter said he opposed the admission of his statement to preserve his objection for appeal in case the law changed. When the State attempted to clarify that Porter was not alleging coercion or duress, Porter pointed out that "the arrest itself" (of a minor) was coercive and could be considered duress.

---

[4] Mississippi Code Annotated section 97-3-19(2) provides in part:

(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
. . . .
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery. . . .

5

¶11.   At the hearing, Special Agent Larry Barnum testified that in February 2020, he worked with the Biloxi Police Department as a criminal investigator. He and Investigator James Gladden interviewed Porter about an hour and a half after Porter's arrest and after Porter had been advised of and waived his *Miranda* rights. Porter's parents were not present during the interview because Porter was being investigated and charged as an adult, and as such, it was not required that his parents be present. Porter was just a few months shy of his eighteenth birthday.[5] Barnum said Porter was cooperative, calm, and mentally competent. On his *Miranda* waiver, Porter indicated that he was in the twelfth grade and able to read and write. During the interview, which was both videotaped and audio-recorded, Porter admitted that he was hanging out with Cook, Willow, and Yakeshia, that the girls "had a beef" with Harris, and that they went over to Harris's house to fight. But they also knew Harris sold marijuana. So they decided although they were there to assault Harris, they would also take the marijuana. Porter admitted that he brought the gun and held it on Harris and White at the window while the sisters went inside.

¶12.   Barnum said that Porter gave them his general personal information (address, birthday, social security number, and phone number) clearly and concisely. Porter never requested that his parents be present, and Barnum was not aware that Porter's mother had requested to be present.

¶13.   Investigator Gladden testified that he was a criminal investigator with the Biloxi Police Department at the time of the shooting. He responded to the 911 dispatch and went

---

[5] The shooting took place on February 24, 2020, and Porter turned eighteen in July 2020.

to the hospital first to check on Harris and learned that she had died. He was later involved in Porter's interview. Gladden testified that Barnum was the lead investigator, and he confirmed Barnum's testimony about giving Porter his *Miranda* rights. There was nothing about Porter's demeanor that would suggest he did not understand what was going on. Each right was read to him, and they would stop and ask Porter if he understood it. Gladden said that the whole interview was captured on video and that he never gave Porter any menacing looks or did anything to force him into giving a statement. Porter never requested an attorney or for his parents to be present. Gladden said that the law does not require a parent to be present because Porter was charged with a capital offense.

¶14. Porter presented no rebuttal evidence or testimony. He merely argued that because he was a minor charged with a capital offense, his attorney or, at a minimum, his parents should have been present. Porter cited no precedent to support this position. The State, however, argued that in *Horn v. State*, 825 So. 2d 627, 639 (¶45) (Miss. 2002), the Mississippi Supreme Court held that if the crime is one where the defendant could receive life imprisonment or death, it is not necessary that a minor have a parent present during interrogation.

¶15. The circuit court viewed the videotape of the interrogation and ruled that Porter's statement was freely and voluntarily given with no coercion or undue influence by officers. The court said that Porter, who was close to being eighteen, did not ask for a parent to be present and seemed to understand the questions. Accordingly, the court denied the motion to suppress Porter's statement.

*Trial*

### a. Challenge to Venire

¶16. Porter's trial began on April 13, 2023, the Monday after Easter and the beginning of spring break for the local schools. Porter challenged the venire, which consisted of fifty-seven potential jurors, three of whom were black. This total number increased to fifty-nine when the court added two individuals who were white and Vietnamese and had appeared for county court jury duty despite no county court trial being set. The circuit court determined that Harrison County's population was twenty-five percent black. This ratio was important because Porter's murder trial was a high-profile case, especially because Porter was black, and the victim, Harris, was white.

¶17. The court stated that it was aware of the clerk's procedure in summoning individuals for jury duty. Voters on the rolls were given numbers, and potential jurors were selected by numbers drawn at random. Thus, the court noted race should have played no part in who was summoned for jury duty, and there appeared to be no discrimination in the process of choosing the 350 individuals who were sent summonses. In addition to objecting to the racial composition of the venire, Porter also objected to its size—that only fifty-seven persons responded of the 350 summoned. Porter questioned whether there were a sufficient number of jurors because each side had twelve strikes. The court overruled both objections.

¶18. After the venire was empaneled, it was confirmed that three people were black, three were Hispanic, and one was Asian in the venire. Porter renewed his objection to the venire, and the State responded that the Sixth Amendment did not require a jury to mirror the

community. A violation would have to be the result of a systematic exclusion of black people from the jury-selection process. Porter admitted that there was no systematic intent to exclude blacks in the selection process. However, given the low numbers and percentages, which may have been the result of starting on the Monday after Easter, Porter asked that the trial be postponed until the following week when another venire could be summoned. The court acknowledged that the turnout was lower than normal, but everyone agreed that the process was done correctly, that the attorneys had reviewed the venire, and that no one had detected anything irregular. The court decided to move forward to determine if they could select a jury from the number of potential jurors and denied the objection to the venire. The parties proceeded with voir dire and selected a jury that consisted of eleven white people and one black person.

### b. Opening Statements

¶19. In its opening statement, the State outlined the witnesses, testimony, evidence, and events that would be presented to the jurors, ending with the statement:

> [T]he only verdict that is going to hold this defendant accountable, the only verdict that is going to meet the evidence in this case, and that is to find this defendant, Jaquez Porter, guilty of capital murder.

Porter's attorney began his opening by noting that the situation was terrible and that a serious crime had been committed. He said that Porter:

> [c]ame here and he's - - what we're asking you to do is to consider the evidence and to convict him of the true crime that he committed, that of manslaughter.

Porter's attorney then told the jurors that the other defendants had also been charged with

capital murder, but three of them (Cook, Willow, and Kelley) had pleaded guilty to manslaughter, and Yakeshia had pleaded guilty to second-degree murder in exchange for her plea. Porter's attorney said that Porter, too, was willing to plead guilty to the correct crime.

¶20. At this point, the State objected to Porter's counsel discussing the specifics of plea negotiations instead of what the proof would show. The court was also concerned about telling the jury what Porter had been willing to plead. Porter's attorney argued that this was the theory of the defense, that Porter was charged with the wrong crime, and that he intended to tell the jury about what is needed to prove capital murder and what is needed to establish the lesser-included offense of manslaughter. The court encouraged Porter's attorney to stick to the facts that would be presented, pointing out that the jury did not even know what the law was at that point. Moreover, the differences between the charges and offenses did not have anything to do with what others pleaded to.

¶21. After clarification of what he could discuss, Porter's attorney continued with his opening, telling the jury that Yakeshia's mother had caught White and Harris sneaking into the sisters' room and taking things, including marijuana. So the sisters wanted to go steal marijuana from White and Harris, and the girls enlisted Porter and Cook to help them. Counsel noted that all those involved gave statements, and all lied except Porter. Porter's attorney then told the jury about the different crimes that arise when someone is killed, from capital murder, through first- and second-degree murder, and down to manslaughter and culpable negligence, without objection from the prosecution.

¶22. After opening statements were completed, Porter's counsel addressed the court again

10

on what he considered were the restrictions the court had placed on him during his opening statement when the court would not let him get into detail on the plea agreements of the others who were charged. Porter's attorney said he wanted to tell the jury that what these witnesses would say was not the truth but, rather, what they thought the police wanted to hear. Therefore, because he could not talk about the plea bargains, he could not prepare the jury for his anticipated cross-examination of these witnesses. Consequently, he was unable to give the jury a clear, reasonable, logical outline of what he expected the defense would be. Porter's counsel moved for a mistrial, which the court denied. The court stated that it did not believe that Porter's attorney was limited in any material way and that the jury was made well aware that the others charged had entered into plea bargains.

### c.    Testimony

¶23.    The State presented Ann Myrick, the 911 dispatcher, who testified to Harris's initial 911 call. In that call, before she was cut off, Harris said she was calling to report a robbery. Biloxi police officers Matthew Boone and Louis Beck testified that they arrived at the Harris residence after emergency personnel (fire department and EMT). Boone and Beck testified about their conversations with White and their collection of the gun that White had taken from Yakeshia. Harris's grandfather, James Waldeck, who owned the home, testified about the Ring doorbell videos, and Stewart Harris, the victim's father, testified to his response to the gunshot and finding his daughter.

¶24.    White testified to the facts stated above. During his cross-examination, when White could not recall certain facts, such as whether Harris routinely kept her bedroom door locked,

Porter referred to a statement that White had given the police. Porter asked if reviewing it would help White refresh his recollection. At no point, however, did Porter show White the statement or seek to have it entered into evidence.

¶25. Willow testified that she had been charged with capital murder but that as part of her plea agreement, the prosecutor would reduce the charge to manslaughter and robbery. When shown her plea petition, which stated that she had stolen and carried away Harris's personal property against Harris's will, Willow said she did not actually do that. However, she testified that the group decided when they went to Harris's house that "if there was anything there, we all agreed to take it . . . marijuana, money, whatever else."

¶26. Cook testified that he had picked up Porter, and they went to Willow and Yakeshia's house to "chill." After going to Walmart and Academy Sports, they went back to the sisters' house, and

> conversation come up about stealing some weed, and Keisha showed me a Snapchat picture that somebody had posted, supposed to have been Madison [Harris], selling weed with a caption saying "shop" and suggest[ed] that we go steal some weed.

Cook said they were all involved in the conversation and agreed that he (Cook) would steal the weed, and everyone else would help—that he would go in the window and steal the weed. When they got to the house, they went to Harris's bedroom window (where Kelley, Harris, and White were). Cook tried to open it, but something was stopping it from going up all the way. Porter pulled out his gun and pointed it at Harris and White while Willow and Yakeshia entered the house. When they got inside, Yakeshia took the gun from Porter, and Cook said he and Porter ran around to the carport to enter as well. Cook said he went in to steal the

12

weed. They heard the gunfire before they got to the bedroom, and they turned and ran.

¶27. Biloxi police officer Todre Klopton testified about the arrests of Willow, Yakeshia, and Porter. Klopton said he went to Porter's home, told Porter's mother why he was there, and the mother told him Porter was in the shower. Klopton drew his gun, announced his presence to Porter, and arrested Porter as he came out of the shower, wearing a towel. Klopton, who had reviewed the doorbell-camera footage prior to coming to Porter's residence, recalled that one of the males wore a blue sweatshirt and pants with red underwear showing. Klopton saw such clothing in Porter's bedroom and collected it as evidence. He also confiscated a pair of black tennis shoes with mud and grass on them in the garage.

¶28. Narcotics Lieutenant Michael Brennan assisted in the investigation and testified about his arrest of the Blackmon sisters. He described the dark-colored bandanas, the black Adidas hooded sweatshirts, black athletic pants, black ski mask, and cell phones he found.

¶29. The State called Staci Turner, the chief medical examiner for the State of Mississippi, as an expert in forensic pathology. She testified that Harris died from a gunshot wound to her upper torso and that the manner of death was homicide.

¶30. As the final witness in its case-in-chief, the State called Investigator Barnum to enter Porter's statement into evidence. Barnum explained how law enforcement had pursued the evidence, identified each suspect, and what law enforcement learned at each step. He described the vehicle identified on the doorbell-camera footage that led to Cook's arrest. Eventually, they were led to Porter. Barnum testified about the circumstances surrounding Porter's statement, giving the jury the details he had provided to the court in the earlier

13

motion hearing. Barnum identified the audio recording, which was entered into evidence and played for the jury. He further identified the videotape of the interview, which was also entered into evidence and played for the jury. Porter did not object to the admission of either.

¶31.  On cross-examination, Barnum agreed that during his interrogation, Porter could not give his social security number and that he was slow in giving his address, which Barnum thought was understandable since Porter had recently moved to the area from McComb. Barnum also admitted that he had lied to Porter when he told Porter that they had DNA evidence. Barnum testified the crime lab reported that the bullet that struck Harris could not be exactly matched to Porter's gun. It had some similar characteristics—the bullet was fired from the same caliber firearm, and the markings they saw were similar—but "the projectile could not be positively included or excluded." Porter also attempted to question Barnum about statements White made. The State objected that these statements were hearsay, and the court agreed. Porter proffered, among other things, that White could have been the one who shot Harris because he ended up with the gun.

¶32.  The State rested, and Porter moved for a directed verdict, which the court denied. Porter decided not to testify and, instead, attempted to call two character witnesses to testify that he had a reputation for being peaceful and honest. The State objected. Finding that the State had not challenged Porter's truthfulness and that the proof had shown that Porter went to Harris's window and pulled a gun, the court refused to allow such testimony. However, the court allowed Porter to proffer his character witness testimony. This testimony included Kenneth Fitzpatrick, a retired military officer, who last lived in the community near Porter

14

a year and a half earlier and had only seen Porter a couple of times since. Fitzpatrick said that when Porter was young, Fitzpatrick had helped raise Porter, and he was a peaceful person. Porter's other character witness was Dwight Lee, a police officer, contractor, and pastor in McComb. Lee testified that he had known Porter since Porter was six years old and that Porter had a reputation for being honest and peaceful. However, he, too, had not seen Porter in the last year and a half. After this proffer, Porter rested.

### d. Jury Instructions

¶33. Porter proposed several lesser-included manslaughter instructions that the court refused to give the jury.

### Closing Arguments

¶34. The parties argued the evidence and its application to the law to the jury. The only objections Porter made were to two statements at the end of the State's rebuttal. The prosecutor said:

> So my time is wrapping up here, but the defense again - - they're trying to get you to feel sympathetic for the defendant, you know. And as I was sitting over here listening to that, I kind of drifted back of February 24 of 2020, and I thought about what it must have been like for Stewart when he went in to Madison's room and he held his 16-year-old daughter in his hands unresponsive for the last time and - -[.]

After Porter objected, the court directed the State to move on. The prosecutor then concluded:

> So ladies and gentlemen, this case boils down to accountability. Each and every one of you all get held accountable for the acts that you take. I get held accountable for every action that I take. The defendant is sitting here - -[.]

Porter objected to the prosecutor injecting himself into the case and noted that the State's

time for rebuttal had expired. The court did not rule on the substance of the remark, only that the State was out of time. The State went on to simply ask the jury to find Porter guilty of capital murder.

### e.     Jury Deliberations, Note, and Verdict

¶35.    During its deliberations, the jury sent out a question: "If defendant is found not guilty—will he be free?" Porter moved for a mistrial, arguing the note reflected that the jury could not deliberate in conformity with the law. Although the court heard the argument, it made no ruling on the motion. After conferring with parties, the circuit court responded to the note, writing, "[Y]ou have all of the evidence and instructions[,] please contin[u]e to deliberate." Both the State and Porter had no objection to the court's response.[6]

¶36.    The jury ultimately found Porter guilty of capital murder. The circuit court later sentenced Porter to life imprisonment with eligibility for parole. Porter filed a motion for a new trial or judgment notwithstanding the verdict, which the court denied.

### Appeal

¶37.    Porter appeals and raises several issues, which he states as follows:

I.      The trial court erred when it denied Porter's motion to suppress his statements to police that were made without the presence of an attorney or his mother.

II.     The trial court erred when it failed to disqualify the venire due to the extreme lack of potential African American venire caused by

---

[6] The jury sent out two other notes: one asked for a device to play the video disks, and another queried, "Definition of robbery? Intent to rob? Do they have to have taken anything?" The court responded that the jury had all the evidence and instructions and should continue to deliberate. Porter did not object or move for a mistrial in response to the manner in which the court handled these two notes.

scheduling the trial the day after Easter Sunday (Good Monday).

III.    The trial court erred when it restricted Porter's attorney's opening statement with respect to the co-defendants getting extensive plea agreements on the condition that they testify against Porter.

IV.    The trial court erred by not allowing Porter's attorney to impeach State's witness Paul White through the chief investigator.

V.    The trial court erred by not allowing Porter to put on character witnesses.

VI.    The trial court erred by not allowing Porter to submit a lesser-included offense instruction of manslaughter to the jury.

VII.    The trial court erred by not granting a mistrial, and the state committed prosecutorial misconduct by violating the "Golden Rule" during closing arguments by stating: "And as I was sitting over here listening to that, I thought about what it must have been like for Stewart when he went in there to Madison's room and held his 16-year-old daughter in his hands unresponsive for the last time."

and

The State committed prosecutorial misconduct during closing arguments when the prosecutor interjected himself into the case by stating: "So, ladies and gentlemen, this case boils down to accountability, each and every one of you all get held accountable for the acts that you take. I get held accountable for every action I take . . . ."

VIII.    The trial court erred by not granting a mistrial when the jury sent out its first note asking, "Question, if Defendant is found not guilty will he be free?"

IX.    The trial court erred by not granting a mistrial due to the cumulative effect of the trial court's errors and the prosecutorial misconduct that cumulatively resulted in Porter not receiving a fair trial.

## DISCUSSION

**I.**    **Whether the circuit court erred when it denied Porter's motion to**

17

**suppress his statements.**

¶38.    Porter contends that the circuit court erred when it allowed the video and audio tapes of his recorded statement to be entered into evidence because Porter's mother was not allowed to be present.  However, Porter concedes that Mississippi courts have held that a minor's statement may be entered into evidence if he is charged with a capital offense.  Instead, he urges us to change that law, but he gives us little factual justification and no legal precedent to do so.

¶39.    Under *Miranda*, 384 U.S. at 479, an individual in custody has the right to remain silent and to have an attorney present during interrogation.  The State bears the burden of demonstrating that a defendant knowingly, intelligently, and voluntarily waived these rights.  *Barnes v. State*, 30 So. 3d 313, 316 (¶8) (Miss. 2010).  Our review of whether a confession was voluntary is limited.  *Horne v. State*, 825 So. 2d 627, 638 (¶44) (Miss. 2002).  "We will only reverse a trial court's denial of a motion to suppress [a defendant's statement] 'if the ruling is manifest error or contrary to the overwhelming weight of the evidence.'"  *Moore v. State*, 287 So. 3d 905, 911-12 (¶20) (Miss. 2019) (quoting *Barnes*, 30 So. 3d at 316 (¶8)).

¶40.    "When determining the admissibility of a minor's confession, inquiry must be made into the totality of the circumstances surrounding the interrogation."  *Clemons v. State*, 733 So. 2d 266, 269 (¶10) (Miss. 1999).  This includes reviewing the testimony of the investigating officers and determining the absence of evidence of mental or intellectual impairment or any factors attributable to the minor's age.  *Id.*  In *Clemons*, which involved a fourteen-year-old defendant's confession to shooting one of three victims, the Mississippi

18

Supreme Court found no merit to Clemons's assertion that he should have been allowed to a have a parent present. *Id*. at 270 (¶14). The Court cited *Blue v. State*, 674 So. 2d 1184 (Miss. 1996),[7] stating, "[W]here the crime is such that circuit court has original jurisdiction, age had no special bearing on his ability to be questioned without a parent and voluntarily waive his rights." *Clemons*, 733 So. 2d at 270 (¶14). This includes crimes where the minor could receive life imprisonment or death. *Horne*, 825 So. 2d at 639 (¶45). In such a case, it is not necessary that the minor's parent be present during interrogation. *Id*.

¶41. In the case at hand, the circuit court viewed the tapes of Porter's statement and found no threats, coercion, or undue influence by the investigators. The court found that the officers had methodically reviewed and explained each of Porter's rights to him and that Porter, who was nearly eighteen, could be seen signing the statement. Porter was in the twelfth grade and charged with a capital offense that could result in a sentence of life in prison. He did not ask for either a parent or an attorney to be present. Given the charge he faced, Porter was not entitled to have a parent present, and the court found that he knowingly, intelligently, and voluntarily waived his right to remain silent and be represented by counsel during the interrogation. From our review of the record and precedent, we agree with the circuit court and find no error in the court's denial of Porter's motion to suppress.

II. **Whether the circuit court erred when it failed to disqualify the venire or order a mistrial.**

¶42. Porter sought a mistrial based on the size and composition of the venire. The number

---

[7] *Overruled on other grounds by King v. State*, 784 So. 2d 884, 889-90 (¶¶21-23) (Miss. 2001).

of individuals in the venire was below the normal number that the court usually experienced. When 400 summonses were sent out, the court stated usually "80 or so" would respond. In this case, 350 summonses were issued, and fifty-seven individuals appeared. Of those, only three individuals were black in a county with a 25% black population. When two individuals summoned for county court duty were added, clearly blacks were underrepresented in the venire. Porter, who is black, contends that this underrepresentation denied him a fair trial.

¶43.    In *Billue v. State*, 64 So. 3d 589 (Miss. Ct. App. 2011), this Court reiterated the three-prong test courts are to use to determine if a defendant is denied a fair trial based on the racial composition of the venire. In that case, Billue, an African American, was charged with and convicted of stealing a truck. *Id*. at 591 (¶7). On appeal, he claimed that the circuit court erred in refusing to shuffle the venire in order to move more African American jurors up in the order of selection. *Id*. at 592 (¶8). Finding no error, we noted:

> Defendants have a right to a trial before a jury selected through nondiscriminatory means, but "the Sixth Amendment has never been held to require that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."

*Id.* at (¶9) (quoting *Simon v. State*, 688 So. 2d 791, 806 (Miss. 1997)). We stated that the three-prong test for determining whether the selection has been fair requires that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venire from which jury is selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this under representation is due to the systematic exclusion of the group in the jury-selection process. *Id*. at (¶10).

¶44.    In the case at hand, Porter points out that his facts meet the first and second criteria.

20

Being African American, he is part of a "distinctive " group in the county, and only three of fifty-nine venire members were African American (5%) while the county was 25% African American. However, Porter fails to articulate any systematic exclusion of blacks in the jury-selection process. Porter concedes that "as far as element three (3), the undersigned cannot speak to that." Without some proof that black people were intentionally or systematically excluded because of their race, Porter has no viable Sixth Amendment claim. Accordingly, we find no merit to this issue.

### III.    Whether the circuit court erred when it restricted Porter's attorney's opening statement.

¶45.    Porter argues that the circuit court erroneously restricted his attorney during opening statements when the court would not allow him to tell the jurors the details of his co-indictees' plea bargains. Porter says one theory of his defense was that the evidence did not support capital murder; instead, it supported manslaughter, the crime to which everyone except Yakeshia had pleaded guilty.[8] When the circuit court sustained the State's objection to Porter's continued statements about the plea negotiations and restricted Porter to what the facts would prove, Porter contends he was unable to prepare the jury for his defense.

¶46.    "The purpose of an opening statement is to inform the jury what a party to the litigation expects the proof to show." *Jones v. State*, 390 So. 3d 498, 502 (¶15) (Miss. 2024); *Hutto v. State*, 227 So. 3d 963, 986 (¶72) (Miss. 2017). Attorneys are allowed wide latitude in presenting their opening statements and closing arguments. *Hutto v. State*, 227 So. 3d at

---

[8] Porter's second defense was that White had a gun, and it was the bullet from White's gun that caused Harris's death.

21

986 (¶72). However, a trial court is given considerable discretion in determining whether remarks in opening should be allowed. *Averett v. State*, 189 So. 3d 641, 647 (¶20) (Miss. Ct. App. 2015). Moreover, "[t]he circuit judge is in the best position to weigh the consequences of the objectionable argument, and unless serious and irreparable damage has been done, admonish the jury then and there to disregard the improper comment." *Keller v. State*, 138 So. 3d 817, 864 (¶127) (Miss. 2014).

¶47. In the case at hand, the State did not object until after Porter's attorney had already told the jury the crimes each of Porter's co-indictees had pleaded guilty to committing. Porter's attorney also had told the jury that Porter was willing to plead guilty to manslaughter. So Porter had already informed the jury of the pleas that Porter's co-indictees had negotiated. But Porter claims he needed to say more about the plea negotiations to ready the jury for his cross-examination of these witnesses on their statements. Porter claims he wanted to tell the jury in the opening statement that the co-indictees would not be testifying to the truth but to what the police wanted them to say. However, this is clearly an argument, not a fact.

¶48. Here, Porter was allowed in his opening statement to tell the jury the basic facts of the plea bargains reached by the other co-indictees and communicate that he, too, desired to plead guilty to manslaughter. There was no need for further embellishment of those facts. We find no abuse of the considerable discretion given to the circuit court or error in limiting Porter to a presentation of the facts he desired to present.

IV. **Whether the circuit court erred by not allowing Porter's attorney to impeach State's witness Paul White by questioning the chief**

22

**investigator.**

¶49.     Porter next argues that the circuit court erred in sustaining the State's objection to Porter's questions to Investigator Barnum about statements White made.  However, Porter cites no legal authority to support his argument of error.  An issue is procedurally barred from consideration on appeal if a party fails to cite authority to support an argument.  *Hale v. State*, 191 So. 3d 719, 728 (¶26) (Miss. 2016).  Accordingly, we need not consider this issue on appeal.

¶50.     Notwithstanding the procedural bar, we find no merit to Porter's argument.  During the trial, the State called White as a witness before Barnum testified.  During White's cross-examination, Porter asked him what he had told Barnum concerning White's struggle to disarm Keisha.  White admitted he told Barnum that Yakeshia tried to push him away to prevent being disarmed.  White admitted that he told Barnum that during the struggle for the gun, it angled up toward the ceiling and discharged.  The only thing White denied telling Barnum was that he grasped the barrel of the gun.  White testified that he grabbed Yakeshia's wrist and never touched the barrel.

¶51.     When Barnum testified, Porter cross-examined him about compiling his report on the case and confirmed that Barnum had spoken to White.  The defense then asked, "Now in talking with Paul (White), isn't it true that *he said* that Keisha - - he said that - -."  The State objected to the solicitation of hearsay testimony and the court sustained the objection.  The defense then  questioned Barnum further and established that he did speak to White about what happened. The defense then asked:

Q. Did he (White) describe whether or not - - not saying what he said, but did he describe whether or not he had his hands on the gun at the time it was fired?

A. Yes. He described that - - he also was from - - that his hands was on the firearm as well.

Q. At the time it was discharged?

A. Yes.

At this point the jury was excused, and the defense proffered that if allowed, it would question Barnum further about what White specifically told him about struggling for the gun, i.e., that White said he had his left hand on Keisha's forearm and his right hand on the barrel of the gun. The defense also proffered that White also told Barnum other things, such as the reason White believed Madison wanted him to come back to her house, why White decided to go back, and how White felt Jasmine was instigating confrontations between Madison and the Blackmon sisters. The State pointed out that White had not been asked about these things or been given the opportunity to refresh his recollections about these statements, and thus no foundation had been laid under Mississippi Rule of Evidence 613(b).

¶52. We review the decisions of a trial court on the admissibility of evidence for abuse of discretion. *Portis v. State*, 245 So. 3d 457, 468 (¶26) (Miss. 2018). Mississippi Rule of Evidence 613(b) provides:

> **Extrinsic Evidence of a Prior Inconsistent Statement**. Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires.

Here, White had been asked about what he told Barnum about his struggle to disarm Keisha.

He admitted much of what he told Barnum but only denied that he had his hand on the barrel of the gun. Thus, the defense laid the foundation needed to allow Barnum to impeach White on whether he touched the gun. Porter did this when his attorney elicited Barnum's testimony that White had told him that his (White's) "hands" were on the gun. However, Porter failed to lay the proper foundation under Rule 613 for the admission of the statements made by White to Barnum on the other matters Porter raised in his proffer. Porter never asked White about Madison wanting him to come back to the house, White's questioning why Jasmine was at the house, or whether he felt Jasmine was instigating confrontations between Madison and the Blackmon sisters. Nor did Porter ask White if he had said anything differently about these matters to Barnum. Accordingly, because Porter was allowed to impeach White's statements about handling the gun, the court's ruling resulted in no prejudice to Porter. Further, because Porter had failed to lay a foundation under Rule 613(b) to question Barnum about other matters White had told him, we find no error in the court's limiting Porter's questioning of Barnum for impeachment purposes.

### V. Whether the circuit court erred by excluding character witnesses.

¶53. After Porter decided not to testify, he sought to call two witnesses to testify to his reputation in the community for being honest and peaceful. The circuit court refused to allow these character witnesses to testify, and Porter contends that the court erred in doing so.

¶54. "The standard of review for the admission or exclusion of evidence is abuse of discretion." *Johnson v. State*, 242 So. 3d 145, 153 (¶15) (Miss. Ct. App. 2017). "We give

25

great deference to the discretion of the trial judge, and unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, the trial judge's decision will stand." *Griffin v. State*, 269 So. 3d 337, 346 (¶24) (Miss. Ct. App. 2018).

¶55. In civil cases, Mississippi Rule of Evidence 404(a)(1) generally excludes evidence of a person's character to show that on a particular occasion he acted in accordance with that character trait. *Decatur v. State*, 324 So. 3d 1154, 1160 (¶16) (Miss. Ct. App. 2021). However, Rule 404(a)(2)(A) permits a criminal defendant to offer evidence of his own pertinent trait to establish that his actions in a particular instance did not conform to his character. *Id.* For example, as in *Decatur*, a defendant's propensity for violence or peacefulness may be relevant in a shooting case to determine whether the defendant acted in self-defense. *Id.* at 1160 (¶¶17-18). Although the defendant himself need not testify, "the 'character evidence' that could be allowed would only be evidence to prove that on a particular occasion the person acted in accordance with the character or trait." *Williams v. State*, 281 So. 3d 263, 270-71 (¶19) (Miss. Ct. App. 2019).

¶56. Porter argues that the investigators telling Porter during Porter's videotaped statement that he was lying put Porter's character for truthfulness and honesty at issue. However, throughout the trial, Porter contended that he, not his co-indictees, were telling the truth. By entering Porter's statement, the State obviously did not contest its truth. Moreover, Porter contends that the testimony of his character witnesses that Porter was a peaceful person would support the defense that Porter only had a gun to prevent White from intervening in the fight between Harris and the sisters. However, the circuit court did not perceive Porter's

26

actions in holding a gun and pointing at Harris and White as part of any peace-keeping effort. In a case where a defendant had shot at a vehicle with several teenage passengers and later shot at law enforcement who had pursued him, and sought to enter evidence of his peaceful character, the Mississippi Supreme Court stated:

> This Court will not reverse a trial judge's decision to exclude evidence unless we find that the trial judge's decision was arbitrary and clearly erroneous. Because Toler admitted to brandishing, aiming, and firing a handgun, in addition to his theory of the case that he merely intended to scare the youths and to provoke the law enforcement officers to shoot him, the trial judge's decision to exclude evidence of Toler's character of peacefulness was not arbitrary and clearly erroneous. Accordingly, we find that the trial judge did not abuse his discretion.

*Toler v. State*, No. 2023-KA-00712-SCT, 2024 WL 4795151, at *9 (¶47) (Miss. Nov. 14, 2024), *mot. for reh'g filed* (January 16, 2025) (citation omitted)). In the case at hand, if Porter had a character trait of peacefulness, on February 24, 2020, he acted contrary to it rather than consistent with it as required by Mississippi Rule of Evidence 404(a)(2)(A). In light of the facts and testimony presented in this case, we find that the circuit court did not act arbitrarily or abuse its discretion when it excluded Porter's character witnesses.

**VI.** **Whether the circuit court erred by refusing Porter's lesser-included offense instruction of manslaughter.**

¶57. Porter argues the proof established that Porter and the group went to Harris's with the intent to fight her, not rob her. Thus, he contends, there was no basis for the capital murder charge, and the jury should have been given an instruction on the lesser-included offense of manslaughter. However, in his brief, Porter cites no legal authority to support his argument. An issue is procedurally barred from consideration on appeal if a party fails to cite authority

27

support an argument. *Hale v. State*, 191 So. 3d 719, 728 (¶26) (Miss. 2016). Accordingly, we need not consider this issue on appeal.

¶58. Notwithstanding the procedural bar, we find that Porter's argument is without merit. "We review the refusal of a lesser-included-offense instruction de novo." *Frazier v. State*, 382 So. 3d 1193, 1200 (¶21) (Miss. Ct. App. 2024).

> A defendant is entitled to have every legal defense he asserts to be submitted as factual issue for determination by the jury under proper instruction of the court. However, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Croom v. State*, 374 So. 3d 609, 612-13 (¶10) (Miss. Ct. App. 2023) (citations and internal quotation marks omitted). A trial court does not err in refusing a lesser-included-offense instruction if, taking the evidence in the light most favorable to the accused and considering all reasonable inferences that may be drawn in favor of the accused from the evidence, the trial court determines that no reasonable jury could find the defendant guilty of the lesser-included offense and conversely not guilty of at least one essential element of the principal offense. *Id*.

¶59. In the case at hand, Porter was charged with capital murder, which is defined as

> [t]he killing of a human being without the authority of law by any means or in any manner . . . when done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery. . . or in any attempt to commit such felonies[.]

Miss. Code Ann. § 97-3-19(2)(e). A potential lesser-included offense, manslaughter, is defined as

> [t]he killing of a human being, without malice, in the heat of passion, but in a

cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense[.]

Miss. Code Ann. § 97-3-35 (Rev. 2020). To be entitled to this manslaughter instruction, Porter would have to show that on the evidence presented, a reasonable jury could find him not guilty of killing Harris while engaged in a robbery but guilty of killing her in the heat of passion using a dangerous weapon and not in self-defense.

¶60. *Ronk v. State*, 172 So. 3d 1112 (Miss. 2015), illustrates the analysis of the denial of a lesser-included offense manslaughter instruction. There Ronk admitted to law enforcement that he had argued with Marie Craite, a rich widow he had been dating. *Id*. at 1123 (¶11). He said that she had attacked him with a knife, he disarmed her, and he stabbed her when she threatened to get a shotgun and kill him. *Id*. Ronk then poured gasoline over the home, lit it, and left Craite to burn. *Id*. Ronk was charged with capital murder with the underlying felony of arson. *Id*. at 1124 (¶14). On appeal of his conviction, Ronk argued, among other things, that the trial court erred in refusing his proposed imperfect self-defense instruction.[9] *Id*. at 1125 (¶21). "The trial court denied this instruction, finding that a reasonable jury could not acquit Ronk of capital murder and convict him of manslaughter based on the evidence presented at trial." *Id*. Ronk argued on appeal that a jury could find him guilty of imperfect self-defense manslaughter rather than capital murder. *Id*. However, the Mississippi Supreme Court stated, "This Court has held that a jury instruction on a lesser-included offense should

---

[9] "Unlike true self-defense, imperfect self-defense is not a defense to a criminal act. Rather, under the theory of imperfect self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Brown v. State*, 222 So. 3d 302, 307 (¶21) (Miss. 2017) (citation omitted).

be granted where a rational jury could find the defendant not guilty of the principal charge made in the indictment but guilty of a lesser included offense." *Id*. at 1126 (¶22). The Court pointed out that capital murder statute requires the State to prove that a killing occurred while the defendant was engaged in the commission of a designated crime. *Id*. at (¶23). "Unlike other sections of the capital murder statute, Subsection 2(e) does not require the prosecution to prove the elements of murder, only that a killing took place while the accused was 'engaged in the commission' of the enumerated felonies." *Id*. The Court further held, "If the jury found that Craite's death occurred while Ronk was engaged in the commission of an arson, the fact that the killing was a manslaughter rather than a murder would have no effect on his guilt under Section 97-3-19(2)(e)." *Id*. at 1127 (¶23).

¶61. In this case, Porter proposed the following jury instruction (D-7a1) as a manslaughter instruction that read:

> In the event that you the jury do not find the State has proven beyond a reasonable doubt the crime of Capital Murder, then you may also consider the lesser crime of Manslaughter. The Court instructs the jury that the crime of manslaughter is committed if the Defendant causes the death of another under circumstances manifesting extreme indifference to the value of human life.
>
> If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1.  On or about February 24, 2020, in Harrison County, Second Judicial District, Mississippi,
>
> 2.  JAQUEZ DEVONTE PORTER, caused the death of Madison Victoria Harris, a human being, without authority of law, under circumstances manifesting extreme indifference to the value of human life.
>
> 3   Then you shall find the defendant guilty of manslaughter; however,

30

If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, not guilty of Manslaughter.

This instruction does not include the element of "heat of passion" and is more akin to a depraved-heart murder instruction.[10] Whatever instruction Porter proposed, however, still had to be supported by the evidence, and the evidence was clear that the group, Porter included, planned to steal Harris's marijuana. Porter and Cook were there for that express reason, as well as to neutralize White, if needed, and the killing occurred while Porter and the others were committing a robbery. The circuit court repeatedly noted this evidence and ultimately determined that no reasonable juror could find Porter not guilty of robbery. We

---

[10] Porter's attorney later presented a revised lesser-included-offense instruction (D-10) as follows:

JAQUEZ DEVONTE PORTER is charged with capital murder.

If you find beyond a reasonable doubt from the evidence in this case that:

1.      On or about February 24, 2020, in Harrison County, Second Judicial District, Mississippi,

2.      While JAQUEZ DEVONTE PORTER, was attempting to commit LARCENY by: feloniously taking, stealing and carrying away any personal property of another, unlawfully and with or without deliberate design killed Madison Victoria Harris, a human being, without authority of law, then you shall find the defendant guilty as charged.

If the State did not prove any one of the above listed elements beyond a reasonable doubt, then you shall find the defendant not guilty.

During discussions about this instruction, Porter's attorney sought to revise it further. He proposed that the court insert language at the beginning of the instruction to add that if the jury did not find Porter guilty of capital murder, then it could continue its deliberations and consider the crime of culpable negligence manslaughter. The court refused this instruction because it did not fit the evidence that was presented.

agree. Just as the Court in *Ronk* stated, in this case if the jury found that Harris's death occurred while Porter was engaged in the commission of robbery, the fact that the killing was manslaughter rather than murder would have no effect on his guilt under section 97-3-19(2)(e). Accordingly, we find no error by the court in refusing the instructions proposed by Porter because they had no foundation in the evidence and because a reasonable jury could find him guilty of capital murder.

### VII. Whether the circuit court erred by not granting a mistrial for the State's remarks during closing.

¶62. At the end of its rebuttal argument to the jury, the State made two remarks, one referring to Harris's father holding his child for the last time, and the other dealing with personal accountability. Porter objected and moved for a mistrial, which the circuit court denied. On appeal, Porter contends that these remarks were improper and warrant reversal.

¶63. "Attorneys are generally afforded wide latitude in closing arguments." *Miskell v. State*, 270 So. 3d 23, 33 (¶35) (Miss. Ct. App. 2018). However, "[a] golden-rule argument, in which an attorney asks the jurors to put themselves in the place of one of the parties, is prohibited." *Holliman v. State*, 79 So. 3d 496, 500 (¶18) (Miss. 2011) (citing *Wells v. State*, 698 So. 2d 497, 507 (Miss. 1997)). An example of this is the *Holliman* case, where a wife was shot in the face by her husband, and the prosecutor had repeatedly asked jurors how they would feel to have a loaded shotgun pointed at their faces. *Holliman*, 79 So. 3d at 499 (¶16).

¶64. However, even when the State makes improper comments, we have recognized that "not every improper comment rises to the level of reversible error." *Hearns v. State*, 313 So. 3d 533, 537 (¶12) (Miss. Ct. App. 2021). The Mississippi Supreme Court has held that even

if a statement constituted a "golden-rule" argument, there must be evidence suggesting that a defendant was unduly prejudiced by the statement. *McCoy v. State*, 147 So. 3d 333, 345 (¶31) (Miss. 2014).

> Even when a prosecutor has made an impermissible comment, this Court requires a showing of prejudice to warrant reversal. Where a prosecutor has made an improper argument, the question on appeal is whether the natural and probable effect of the improper argument creates an unjust prejudice against the accused resulting in a decision influenced by the prejudice so created.

*Outerbridge v. State*, 947 So. 2d 279, 286 (¶23) (Miss. 2006).

¶65. "On appeal this Court reviews the propriety of closing arguments with discretion to the trial court." *Id.* at 285 (¶20). "The Mississippi Supreme Court has held that 'a trial judge is best suited to determine the prejudicial effect of an objectionable remark and is given considerable discretion in deciding whether the remark is so prejudicial as to merit a mistrial.'" *Dorsey v. State*, 310 So. 3d 1238, 1249 (¶36) (Miss. Ct. App. 2021) (quoting *Flora v. State*, 925 So. 2d 797, 804 (¶5) (Miss. 2006)).

### A. Stewart Harris Comment

¶66. In this case, the State referred to the victim's father, stating:

> [T]he defense again - - they are trying to get you to feel sympathetic for the defendant, you know. And as I was sitting over here listening to that, I thought about what it must have been like for Stewart when he went in there to Madison's room and held his 16-year old daughter in his hands unresponsive for the last time.

"Any alleged improper prosecutorial comments must be considered in the context of the circumstances of the case." *Miskell*, 270 So. 3d at 33 (¶35). In this case, the prosecutor's remarks are consistent with the facts shown, namely that Stewart found his daughter, tried

33

to perform CPR, and was holding her when medical personnel arrived. Moreover, Porter's attorney had just argued to that jury that he was putting Porter in their hands and that "they had the power to crush him," along with "everything he ever dreamed of, everything he ever hoped to achieve - - the value of his life is at issue."

¶67. Both sides were clearly seeking the jury's sympathy. However, we note that the prosecutor said what *h*e thought Stewart may have felt; the State did not ask the jurors to put themselves in Stewart's shoes, a factor the Mississippi Supreme Court noted in *Outerbridge*. There, the victim of a shooting identified Outerbridge as the shooter, and in closing, the State argued, "You never forget the man that puts a gun to your chest and holds your life in his hands . . . .This is not a face you forget . . . . I hope that none of you ever have to be in this situation." *Outerbridge*, 947 So. 2d at 285 (¶19). The Mississippi Supreme Court, noting the trial court's discretion and the fact that the comment did not ask the jurors to put themselves in the victim's place when determining Outerbridge's guilt, found no error. *Id*. at 286 (¶24). In the case at hand, the State did not ask the jury to put themselves in Stewart's shoes.

¶68. In *Evans v. State*, 226 So. 3d 1, 32 (¶76) (Miss. 2017), the Mississippi Supreme Court considered the following argument by the State:

> Ladies and gentlemen, I know it's been a long week and you have been through a lot and I don't need to stand before you and recount that last day that Wenda Holling experienced, but as I sat here and I listened to Mr. Burrell talk about the last images of her life, the last thing she saw was this defendant, I couldn't help but go back in my mind and wonder one thing. What were her thoughts at that time? So much yesterday we spent talking about this defendant, his life, but what were hers at the age of 70 as the breath left her body in the last moments that day. What were her thoughts of John, of

34

> Barbara, her family, or even the defendant asking why, how could you. I took you into my home.
>
> . . . .
>
> Even today, all this time, he presents to you hollow promises, just like he did back then. He asked you for mercy. What mercy did he show Wenda Holling? What mercy did he show her family when he publicized their mother's death for all of South Mississippi to read about. What mercy did he show today?

The Court held that "[w]hile the prosecutor's argument in the instant case approaches a golden-rule violation, the argument was not so inflammatory as to have required intervention by the trial court. Thus, no plain error occurred." *Id*. at (¶39). In the case at hand, the prosecutor's brief remark concerning the victim's father falls far short of the State's remarks in *Evans*. We find that the State's comment did not constitute an impermissible golden-rule violation, nor was it so inflammatory as to warrant sua sponte action by the court.

¶69. Even if the remark were a golden-rule violation, there is no reversible error. This Court has stated that there is no reversible error if, taking away the State's improper comments, there was still sufficient evidence, beyond a reasonable doubt, for a jury to convict a defendant of the acts for which he was charged. *McCoy v. State*, 954 So. 2d 479, 489 (¶¶30-31) (Miss. Ct. App. 2007). In the case at hand, there was ample testimony and physical evidence against Porter to support the jury's verdict of guilty. Thus, we do not find that the natural and probable effect of the State's comment created unjust prejudice in this instance, and any error was harmless.

### B. Accountability Comment

¶70. The State also made another comment concerning accountability:

So, ladies and gentlemen, this case boils down to accountability, each and every one of you all get held accountable for the acts that you take. I get held accountable for every action I take.

Porter argues that this remark was improper for two reasons.

¶71. First, Porter asserts that in this remark, the prosecutor improperly interjected himself personally into the case, citing *Foster v. State*, 639 So. 2d 1263 (Miss. 1994). However, *Foster* forbids a prosecutor from interjecting his personal beliefs *regarding the veracity of witnesses*. *Id*. at 1288. The *Foster* court quoted *United States v. Garza*, 608 F.2d 659, 665-66 (5th Cir. 1979), where the prosecutor improperly said that he personally believed the witnesses for the government over those presented by the defense. The Fifth Circuit considered such statements as an attempt to use the status and influence of the government to bolster the believability of his case. *Garza*, 608 F. 2d at 665-66. *Foster* is clearly inapplicable to the facts of this case, where the prosecutor was merely commenting on the principle of general accountability, which applies to everyone, himself included. Moreover, in *Miskell*, 270 So. 3d at 36 (¶¶47-49), this Court specifically found no error with the State's comments in closing regarding accountability, where the prosecutor said, "There's accountability here in Hattiesburg. We're nowhere else. We will always be for accountability." Accordingly, we find the prosecutor's comments on accountability were not improper.

¶72. Second, Porter argues that the prosecutor's request that the jurors hold Porter accountable constitutes an impermissible "send-a-message" remark. "A 'send[-]the[-] message' argument is one that encourages juries to use their verdict to 'send a message' to

36

the public or to other potential criminals, instead of rendering a verdict based solely on the evidence introduced at the trial of that case." *Harris v. State*, 384 So. 3d 493, 498 (¶13) (Miss. 2024). However, in *McGrath v. State*, 271 So. 3d 437, 443 (¶26) (Miss. 2019), the Mississippi Supreme Court held that the prosecutor did not commit "misconduct by pointing at [the defendant] and asking the jury to hold [him] accountable for his actions with a guilty verdict." The Court stated:

> Here, the judge properly instructed the jury on the elements of the offenses. And "[t]he members of the jury were charged with the duty to make a finding of guilt based on the testimony and evidence presented at trial." *Long v. State*, 52 So. 3d 1188, 1194 (Miss. 2011). What the State argued was nothing more than "simply reiterating the jury's duty set forth in the jury instructions." *Id*.

*Id*. Similarly, in this case, the prosecution's remark concerning accountability was not asking the jury to find Porter guilty despite the proof to "send a message" to the community. Rather, the prosecutor's remark merely reiterated the jury's duty as set forth in the instructions from the court. Accordingly, Porter was not entitled to a mistrial based on these remarks.

### VIII. Whether the circuit court erred by not granting a mistrial when the jury sent out its first note.

¶73. Porter next argues that the circuit court erroneously refused his motion for a mistrial when the jury sent out a note asking, "Question, if Defendant is found not guilty will he be free?" However, the circuit court never ruled on Porter's motion, and "[g]enerally, when a trial court has not ruled on a motion, a defendant is procedurally barred on appeal from claiming error." *Aday-Cazorla v. State*, 309 So. 3d 1169, 1173 (¶11) (Miss. Ct. App. 2021); *see also Hayes v. State*, 801 So. 2d 806, 810 (¶9) (Miss. Ct. App. 2001) ("A party's failure to obtain a ruling on an objection prevents our consideration of the alleged error."). In this

37

case, although Porter moved and argued for a mistrial, after further discussion, he ultimately agreed to the court's response to the first jury note and did not press for a ruling on his motion. Thus, he is procedurally barred from raising this issue on appeal. Notwithstanding the procedural bar, we find no merit to Porter's argument that the court's response to the jury note warranted a mistrial.

¶74. "The Mississippi Rules of Criminal Procedure make it clear that a mistrial may be declared if during the trial, either inside or outside the courtroom, misconduct by a party occurs resulting in substantial and irreparable prejudice to the movant's case." *Scates v. State*, 388 So. 3d 564, 572 (¶24) (Miss. Ct. App. 2023), *cert. denied*, 389 So. 3d 1072 (Miss. 2024). Mississippi Rule of Criminal Procedure 23.5 provides:

> Upon motion of any party, the court may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by a party, a party's attorney(s), or someone acting at the behest of a party or a party's attorney(s), resulting in substantial and irreparable prejudice to the movant's case.

> Upon motion of a party or its own motion, the court may declare a mistrial if:

> > (a) The trial cannot proceed in conformity with the law; or

> > (b) It appears there is no reasonable probability of the jury's agreement upon a verdict.

The standard of review for the denial of a motion for mistrial is abuse of discretion. *Aday-Cazorla v. State*, 309 So. 3d 1169, 1173 (¶7) (Miss. Ct. App. 2021). A trial court is afforded considerable discretion because the judge is in the best position to measure the prejudicial effect of the conduct forming the basis of the motion. *Id.*; *see also Galloway v. State*, 122 So. 3d 614, 634 (¶36) (Miss. 2013) ("When reviewing a trial court's response to

the jury's inquiry, this Court's inquiry is not whether the trial court was 'right or wrong' in its response, but whether the trial court abused its discretion.").

¶75. In Porter's case, the circuit court acted appropriately when the jury sent out its note. The note was read and placed into the record; both State and defense counsel were present and were given an opportunity to suggest a response. Although Porter claims that the note indicated that the jury could not proceed in conformity with the law, we fail to see how the jury's question reflected this. The circuit court directed the jury back to the instructions, one of which, C-1, stated:

> You will conscientiously consider and weigh the evidence and apply the law of the case and that you will reach a true verdict *regardless of what the consequences of such a verdict may be.*

(Emphasis added). We presume that jurors have followed the instruction of the court. *Evans*, 226 So. 3d at 26 (¶60). Accordingly, we find no error in the circuit court's handling of the jury's first note.

### IX. Whether the cumulative errors of the trial denied Porter a fair trial.

¶76. Porter contends that if any errors of the circuit court are found, whether or not harmless, their accumulation warrants reversal of his conviction. "Under the cumulative error doctrine, "one error, standing alone, may not warrant reversal, but reversal may be required if the errors, taken together, create such an atmosphere of bias, passion, and prejudice that they effectively deny the defendant a fundamentally fair trial." *Smith v. State*, 371 So. 3d 783, 795 (¶42) (Miss. Ct. App. 2023). However, in cases where no error can be found, there can be no cumulative error. *Id*. (citing *Thomas v. State*, 249 So. 3d 331, 350

39

(¶66) (Miss. 2018)). Here, as in *Smith*, Porter's argument of cumulative error is without merit because we find no individual errors.

## Conclusion

¶77. We affirm Porter's conviction and sentence for capital murder because we find no merit to any of the issues he raises on appeal. Porter was not entitled to have a parent present during his police interrogation, and there was no other basis shown for suppressing his statement. Although we are concerned with the low number of potential jurors and the underrepresentation of blacks in the venire of this high-profile case, there was no showing that the under representation was due to a systematic exclusion of blacks in the jury-selection process.

¶78. We further find that Porter was not improperly restricted in presenting his opening statement, and he was not entitled to present character witnesses when the character traits he claimed were not relevant to his actions of holding persons at gunpoint as part of his and his co-indictees' plan. Moreover, Porter was not entitled to a manslaughter instruction because no reasonable juror could have found him not guilty of robbery, an element of the capital murder charge here.

¶79. We further find that the State made no improper remarks in closing that warranted reversal of the jury's verdict and that the court's handling of the jury's first note during deliberation was no basis for mistrial. Finding no individual errors, there is no basis for reversal on the cumulative error doctrine.

¶80. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**